14 CV 7114

JUDGE KEENAN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GETTY IMAGES (US), INC.,

Plaintiff,

v.

MICROSOFT CORPORATION,

Defendant.

CIVIL ACTION NO. _____

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF**
**<u>ORDER TO SHOW CAUSE</u>**

95331.1

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................................ ii

INTRODUCTION ......................................................................................................................... 1

BACKGROUND ........................................................................................................................... 2

    A.    Getty Images and Its "Embed" Feature ..................................................................... 2

    B.    Microsoft and the Bing Image Widget....................................................................... 4

ARGUMENT ................................................................................................................................. 8

I.       Getty Images is Likely to Succeed on the Merits. ................................................................. 9

    A.    Defendant Directly Infringes Plaintiff's Exclusive Rights Under Copyright ........ 10

          1.    Plaintiff's Reproduction Right .................................................................. 10

          2.    Plaintiff's Display Right .......................................................................... 11

    B.    Defendant's Infringement Cannot Be Excused As Fair Use .................................. 14

II.      Injunctive Relief Is Necessary To Prevent Irreparable Harm. ............................................ 19

III.    The Balance of Hardships Favors Plaintiff, and Injunctive Relief Furthers the Public Interest. ..................................................................................................................... 21

CONCLUSION ............................................................................................................................. 23

i

# TABLE OF AUTHORITIES

**CASES**

*American Broadcasting Cos. v. Aereo, Inc.*, 134 S. Ct. 2498 (2014) .......................................12, 13

*AFA Dispensing Group B.V. v. Anheuser–Busch, Inc.*, 740 F. Supp. 2d 465 (S.D.N.Y. 2010) ............................................................................................................................................8

*Arista Records, LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010) .............................................................9

*Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124 (S.D.N.Y. 2009) ..........................10

*Associated Press v. Meltwater United States Holdings, Inc.*, 931 F. Supp. 2d 537 (S.D.N.Y. 2013) ..............................................................................................14, 15, 17, 18, 19

*Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014) ....................................................16

*Briggs & Stratton Corp. v. Chongquing Rato Power Co., Ltd*, No. 13-cv-316, 2013 WL 3972391 (N.D.N.Y. July 23, 2013)................................................................................... 8-9, 22

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) ............................................................15

*Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 618 (2013) ...................16

*Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc.*, 150 F.3d 132 (2d Cir. 1998) ...............................................................................................................................17

*Christian Louboutin S.A. v. Yves Saint Laurent America Holdings, Inc.*, 696 F.3d 206 (2d Cir. 2012) ..............................................................................................................................8, 22

*Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30 (2d Cir. 2010)...............................................................................................................9

*CJ Products LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127 (E.D.N.Y. 2011) .....................21

*Complex Systems, Inc. v. ABN AMRO Bank N.V.*, No. 08-cv-7497, 2014 WL 1883474 (S.D.N.Y. May 9, 2014)..................................................................................................19, 20

*Consumers Union of United States, Inc. v. General Signal Corp.*, 724 F.2d 1044 (2d Cir. 1983) ...............................................................................................................................16

*Grand River Enterprises Six Nations, Ltd. v. Pryor*, 481 F.3d 60 (2d Cir. 2007) .........................20

*Infinity Broadcast Corp. v. Kirkwood*, 150 F.3d 104 (2d Cir. 1998)........................................14, 16

*Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003) ..............................................................11

*LaRouche v. Kezer*, 20 F.3d 68 (2d Cir. 1994) ...............................................................................9

*Lennon v. Premise Media Corp.*, 556 F. Supp. 2d 310 (S.D.N.Y. 2008), *declined to follow on other grounds, Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010)............................................9

*Marcus v. Rowley*, 695 F.2d 1171 (9th Cir. 1983)..........................................................................16

*New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305 (S.D.N.Y. 2010) ......................................................................................................................20

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) ...............................12, 13, 18

*Perfect 10, Inc. v. Google, Inc.*, 416 F. Supp. 2d 828 (C.D. Cal. 2006), *aff'd in relevant part sub nom., Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) .......11, 13

*Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393 (2d Cir. 2004)......................................................20

*Rogers v. Koons*, 960 F.2d 301 (2d Cir. 1992) ...............................................................................10

*Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010) ........................................................................8, 22

*Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63 (2d Cir. 1999)...............................................................20

*United States SEC v. Citigroup Global Markets Inc.*, 673 F.3d 158 (2d Cir. 2012) .................9, 22

*WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 1585 (2013) ....21, 22

**STATUTES**

17 U.S.C. § 101...................................................................................................................................11

17 U.S.C. § 106.....................................................................................................................................9

17 U.S.C. § 106(1)..............................................................................................................................10

17 U.S.C. § 106(3)..............................................................................................................................10

17 U.S.C. § 106(5)..............................................................................................................................10

17 U.S.C. § 107...............................................................................................................................9, 14

17 U.S.C. § 502(a)................................................................................................................................8

## INTRODUCTION

Less than two weeks ago, Defendant Microsoft Corporation ("Microsoft") introduced a new service that one would more readily associate with an adjudicated copyright pirate like Grokster or LimeWire than with an established company like Microsoft. The new service, called the "Bing Image Widget," allows website publishers to display on their websites virtually any type of images they desire, which Defendant supplies without regard for, or payment to, the owners of copyright in those images – including copyrights owned or controlled by Plaintiff.

The manner in which Defendant infringes Plaintiff's (and others') copyrights through the Bing Image Widget is brazen, and the scope of that infringement is staggering. Defendant markets the Bing Image Widget to website publishers as a tool to enhance the visual quality of their websites by displaying digital images supplied by Defendant through its proprietary search engine, based on search queries of the website publisher's choosing. The resulting display, Defendant tells website publishers, "enhances your web site . . . and provides your users with beautiful, configurable image galleries and slideshows."[1]

What Defendant fails to mention, however, is that these "beautiful, configurable image galleries and slideshows" typically consist of copyrighted images, including images whose copyrights are owned or controlled by Plaintiff. Rather than draw from a licensed collection of images, Defendant instead gathers these images by crawling as much of the Internet as it can, copying and indexing every image it finds, without regard to the copyright status of the images and without permission from copyright owners like Plaintiff. The supply of images for the Bing Image Widget is therefore in the billions – essentially, the entire universe of images that Defendant can find on the Internet – including Plaintiff's highly valuable copyrighted works. In

---

[1] http://www.bing.com/widget/image

effect, Defendant has turned the entirety of the world's online images into little more than a vast, unlicensed "clip art" collection for the benefit of those website publishers who implement the Bing Image Widget, all without seeking permission from the owners of copyrights in those images.

The injury that Defendant's Bing Image Widget causes Plaintiff – and, if not enjoined immediately, will cause further – is immense and irreparable. Plaintiff is one of the world's largest providers of commercial visual content and the leading provider of commercial images online, representing more than 80 million unique, copyrighted works of digital imagery. Plaintiff's business is thus critically dependent on licensing to others the right to use Plaintiff's images in precisely the manner that Defendant now uses them illegally. By freely providing these images to websites after having copied them from other websites (without any permission to do so), Defendant has all but eliminated the incentive of website publishers to seek proper licenses from Plaintiff for the right to display its images on their websites. Given the nature and scale of Defendant's conduct, the actual injury to Plaintiff is incalculable and cannot be remedied by monetary damages alone. Plaintiff asks, therefore, that the Court enjoin Defendant's Bing Image Widget and award damages arising out of Defendant's unlawful conduct.

## BACKGROUND

### A.   Getty Images and Its "Embed" Feature

Plaintiff Getty Images (US), Inc. ("Getty Images") is one of the world's largest providers of commercial visual content and the leading provider of commercial images online. It supplies imagery, video, and music to business customers for a wide variety of uses, including websites, books, newspapers, magazines, film and television production, advertisements, and product packaging. Included among Getty Images' collection of works are many of the most iconic,

2

creative, and engaging photographic images ever created. Decl. of Yoko Miyashita ("Miyashita Decl.") ¶ 3.

To support these endeavors, Getty Images generates revenue primarily by licensing the rights to use its content. Getty Images owns much of the content it licenses, but also acts as a distributor for more than 150,000 other content suppliers, including photographers, illustrators, filmmakers, media organizations, and other stock photo companies. Getty Images owns or represents more than 80 million unique works of digital imagery. *Id.* ¶ 4. Getty Images was the first company to license imagery via the Internet and currently delivers virtually all of its content through digital means. Getty Images maintains websites at www.gettyimages.com and www.istock.com, where visitors can search and view millions of images and obtain licenses to use them. *See* Decl. of Francis J. Aul ("Aul Decl."), Ex. A, at 1-34; Miyashita Decl. ¶ 5 & Attachment A.

In March 2014, Getty Images revolutionized the way images are licensed and distributed online. Through Getty Images' innovative "Embed" feature, noncommercial websites and users of social media may now use—for free—approximately 50 million of Getty Images' copyrighted images, provided that the image is displayed using Getty Images' "Embed" tool. The "Embed" tool is a short snippet of code (computer instructions) that a website publisher includes in a webpage or a social media user includes in a post in order to embed a specific image within their content. *See* Aul Decl., Ex. A, at 15, 24, 34 & Ex. B. The code automatically causes the computer of a website visitor or a social media participant to obtain the specified image from a Getty Images server, where the image actually resides. The embedded image is displayed in an embedded viewer that includes the Getty Images' logo and the name of the photographer or content supplier. *See* Aul Decl., Ex. D. A click on the image leads the viewer to a page where

3

he or she may license commercial uses on a paid basis. Miyashita Decl. ¶ 6 & Attachments B, C. Getty Images has the right to provide its Embed offering by virtue of its contractual relationships with photographers and content suppliers. *Id.* ¶ 4.

**B.    Microsoft and the Bing Image Widget**

Microsoft is a multinational company that develops, produces, licenses and sells a wide variety of products and services. One of Microsoft's services is an Internet search engine known as "Bing," which includes a specialized, image-oriented search engine called "Bing Image Search." Like other search engines, Bing crawls the Internet for online content and creates an index of that content in a database stored on Bing's own servers. Bing responds to user search queries by consulting its index and providing to the user the content Bing determines is most relevant to the query.

In crawling the Internet for online content, Bing also makes at least one copy of every image that it finds online and stores at least a reduced-size, "thumbnail" copy of each image on its servers. Bing Image Search distributes and displays the thumbnail copies to users in response to image search queries, along with larger-sized images and links to the third-party source websites that host the full-sized images from which Bing's copies were derived.

On or about August 22, 2014, Defendant introduced a new service, the Bing Image Widget, which Defendant markets to website publishers as a tool that "enhances your web site with the power of Bing Image Search and provides your users with beautiful, configurable image galleries and slideshows." Aul Decl., Ex. F, at 1; Miyashita Decl. ¶ 7. Similar to Plaintiff's "Embed" tool, the Bing Image Widget consists of a snippet of code that website publishers can copy from the Bing Image Widget website and paste directly into a page on the publisher's own website. *See* Aul Decl., Ex. E, at 1. Once the code has been added to the website, the site will contain an embedded viewer or panel, bearing the "Bing" logo, in which will be displayed

4

images from Bing Image Search that Defendant has determined are most responsive to a search query of the website publisher's choosing. Miyashita Decl. ¶ 8; *see also, e.g.*, Aul Decl., Ex. H.

Certain features of the display can be customized by the website publisher before he or she copies and pastes the Bing Image Widget code into his or her own pages (the code will change depending on the choices that the website publisher makes). For example, Defendant gives the website publisher the option to have the images presented in either a "collage" or "slideshow" format. If the publisher chooses the "collage" format, the display panel will include a number of different thumbnail-sized images that Bing Image Search determines are relevant to the particular search query. Aul Decl., Ex. E, at 1, 3, 7; Miyashita Decl. ¶ 9. Thus, a query for the words "Marilyn Monroe" yields a collection of thumbnail-sized images of the late actress in the display panel:[2]



---

[2] Aul Decl., Ex. E, at 7.

If the website publisher chooses instead to have a "slideshow," then the display panel will include a number of larger-sized images – between 1 and 25, at the website publisher's election – that will appear one at a time, swapping out every few seconds. Aul Decl., Ex. E, at 2, 4-6, 8; Miyashita Decl. ¶ 9. Again, a query for "Marilyn Monroe" yields a series of larger-sized, interchanging images of Marilyn Monroe in the display panel, which can be limited to a single, static image if the "slideshow" is limited to only one image – an image that, in this example, is part of Getty Images' collection:[3]



Images that Defendant uses to populate the Bing Image Widget display panel with content are not from some collection for which Defendant or users of the Bing Image Widget have obtained licenses to use in this manner. Instead, Defendant draws from the vast repository

---

[3] Aul Decl., Ex. E, at 8; *see also* http://www.gettyimages.com/detail/news-photo/american-film-star-marilyn-monroe-born-norma-jean-mortensen-news-photo/3169185

of images that Bing Image Search has already copied and indexed from the Internet at large, including Plaintiff's copyrighted images, even though Defendant has no license or permission from Plaintiff to do so.  Miyashita Decl. ¶ 10.

If the user of the Bing Image Widget has selected the "collage" view option, then Defendant populates the display panel with Defendant's own thumbnail-sized copies of the images that Defendant stores on its own servers.  If the "slideshow" view is selected, then Defendant directs the user's browser (in a manner that is invisible to the user) to download and display the larger-sized image from the third-party website that hosts the image and from which Defendant, through Bing Image Search, made its copy of the thumbnail version of the image. Although the larger-sized image that appears in the display panel is hosted and served from the third-party source's server, Defendant intentionally masks the third-party source website and any context that surrounds the image as it appears on that third-party site, creating the appearance that the image is instead coming from the Bing-branded display panel.  Further masking the image's origin (and serving Defendant's own commercial interests), clicking the image takes the user not to the third-party source website, but instead to Defendant's own Bing Image Search site.  *Id.* ¶ 11; Compl. ¶ 27.

Although Defendant draws on images and data that it collected through the operation of the Bing search engine, the Bing Image Widget does not function – nor does Defendant promote it – as a search engine that directs users to third-party sources of information online.  To the contrary, Defendant expressly markets the Bing Image Widget as a website enhancement tool, designed to make websites on which the Widget is installed more visually attractive to users and to keep users from leaving the website, thereby increasing the website's economic value.  As

Defendant itself proclaims, the Bing widgets "driv[e] engagement, time-on-site, and user satisfaction." Aul Decl., Ex. G, at 6.

Moreover, Defendant derives significant economic value from the fact that clicking an image in the Bing Image Widget display panel takes the user not to the third-party source website, but instead to Defendant's own Bing Image Search website. Drawing users to its own universe of websites and maximizing the time that users remain there allows Defendant to derive valuable data about those users and increases the value of Defendant's websites for advertising purposes, among others. Indeed, Defendant has expressly reserved the right to charge direct fees for the use of the Bing Image Widget and to further monetize the service by placing advertisements in the Bing results in the display panel. *See* Compl. ¶ 29 & Ex. B (terms of service); *see also* Aul Decl., Ex. F, at 3.

## ARGUMENT

This Court has the authority to "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a); *see AFA Dispensing Grp. B.V. v. Anheuser–Busch, Inc.*, 740 F. Supp. 2d 465, 471 (S.D.N.Y. 2010). Preliminary injunctive relief is appropriate on a showing that (1) the movant will suffer irreparable harm in the absence of such relief and (2) *either* a likelihood of success on the merits *or* sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 215 (2d Cir. 2012). In addition, the "court must consider the balance of hardships between the plaintiff and defendant," *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010), and "ensure that the injunctive provisions of the order do not harm the public interest." *Briggs & Stratton Corp. v. Chongquing*

*Rato Power Co., Ltd*, No. 13-cv-316, 2013 WL 3972391, *1 n.4 (N.D.N.Y. July 23, 2013); *see*

*U.S. SEC v. Citigroup Global Markets Inc.*, 673 F.3d 158, 163 n.1 (2d Cir. 2012).[4]

Getty Images readily meets these standards.  Defendant's actions—the unauthorized

copying, distribution and display of billions of protected images—is run-of-the-mill copyright

infringement, distinguished only by its scale and brazenness.  While Defendant will likely argue

that its infringement should be excused under the "fair use" doctrine, 17 U.S.C. § 107, the fair

use defense is unavailable to Defendant here, as discussed in greater detail below.  With each day

of its continued use, the Bing Image Widget poses a significant and immediate threat to the

economic viability of Plaintiff's business, its photographers and content suppliers, and, indeed,

the entire photographic industry.  The balance of hardships thus tips decisively in favor of the

issuance of interim relief, and such relief would fully serve the public interest.

## I.      Getty Images is Likely to Succeed on the Merits.

Getty Images is overwhelmingly likely to succeed on the merits of its copyright

infringement claims.  Copyright infringement consists of two elements: "(1) ownership of a valid

copyright, and (2) copying of constituent elements of the work that are original" in violation of

one of the exclusive rights granted by 17 U.S.C. § 106.  *Arista Records, LLC v. Doe 3*, 604 F.3d

110, 117 (2d Cir. 2010) ("The word 'copying' is shorthand for the infringing of any of the

---

[4] A heightened standard governs requests for a "'mandatory' preliminary injunction that 'alter[s] the status quo by commanding some positive act.'"  *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 n.4 (2d Cir. 2010) (citation omitted).  Here, the normal standard applies because the relief Plaintiff seeks "command[s]" no "positive act" but merely prohibits Defendant from continuing the infringing use of the widget.  *Id.*; *see Lennon v. Premise Media Corp.*, 556 F. Supp. 2d 310, 319 (S.D.N.Y. 2008) (a request to bar further distribution of a copyrighted work is "prohibitory," whereas the recall of previously distributed copies is "mandatory"), *declined to follow on other grounds*, *Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010).  And the relevant "status quo" is "the last actual, peaceable *uncontested* status which preceded the pending controversy." *LaRouche v. Kezer*, 20 F.3d 68, 74 n.7 (2d Cir. 1994) (emphasis added) (quotation marks omitted) (quoting *Black's Law Dictionary* 1410 (6th ed. 1990)).  Here, that is the status quo prior to Defendant's launch of the widget less than two weeks ago.

copyright owner's … exclusive rights described in § 106" (internal quotation marks omitted)).
Getty Images owns or is the exclusive licensee of copyrights in the works listed in Exhibit A to
the Complaint, each of which is the subject of a certificate of registration from the United States
Copyright Office. The prerequisite of ownership, therefore, is beyond dispute. *See, e.g., Rogers
v. Koons*, 960 F.2d 301, 306 (2d Cir. 1992) ("The Copyright Act makes a certificate of
registration from the U.S. Register of Copyrights *prima facie* evidence of the valid ownership of
a copyright . . . ." (citing 17 U.S.C. § 410(c))); *see also id.* ("Protection under the copyright
statute extends to pictorial works." (citing 17 U.S.C. § 102(a)(5))).

### A.    Defendant Directly Infringes Plaintiff's Exclusive Rights Under Copyright

Among the exclusive rights in Section 106 of the Copyright Act are the rights to
reproduce and publicly display the copyrighted work.  17 U.S.C. § 106(1), (5).  Although the
infringement of either of these rights would be sufficient to justify injunctive relief here,
Defendant infringes both.[5]

#### 1.    Plaintiff's Reproduction Right

As noted above, Defendant crawls the Internet for online content, makes at least one copy
of every image that it finds online, and stores at least a reduced-size, "thumbnail" copy of each
image on its own servers. This massive copying, which includes Plaintiff's copyrighted images,
infringes Plaintiff's reproduction right under Section 106 of the Copyright Act. *See Arista
Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 149 (S.D.N.Y. 2009) (reproduction right
infringed where defendants "download[ed] copies of Plaintiffs' works" and "creat[ed] copies of

---

[5] Defendant also infringes Plaintiff's distribution right, 17 U.S.C. § 106(3), but the court need not
find as much in order to award the emergency relief requested here.  Should the case proceed
beyond a preliminary injunction, Plaintiff will address the distribution right in greater detail at
that point.

the works on their computers without Plaintiffs' authorization").    Indeed, when technology companies have been sued for similar conduct in the past, they have not even bothered to contest this obvious point, arguing instead that their unauthorized copying was fair use – a defense that, as described below, is unavailable to Defendant here. *See Perfect 10, Inc. v. Google, Inc.*, 416 F. Supp. 2d 828, 838 (C.D. Cal. 2006) ("Google concedes that it creates and displays thumbnails" of plaintiff's images), *aff'd in relevant part sub nom., Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 817 (9th Cir. 2003) ("As to the thumbnails, [the search engine] conceded that [plaintiff] established a prima facie case of infringement of [plaintiff's] reproduction rights").

> 2.    Plaintiff's Display Right

The display right is violated when anyone, without permission of the copyright owner, "show[s] a copy" of the work "either directly or by means of ... any ... device or process."  17 U.S.C. § 101 (definition of "display").  This is precisely what Defendant does when it populates the Bing Image Widget with Plaintiff's (and other copyright owners') copyrighted images.

When the Bing Image Widget is set to "collage" view, Defendant populates the display panel with its own thumbnail copies of images from its own servers.  Clearly, this means that Defendant is "displaying" those images for purposes of the Copyright Act, as courts have readily found:

> [B]ased on the plain language of the statute, a person displays a photographic image by using a computer to fill a computer screen with a copy of the photographic image fixed in the computer's memory. There is no dispute that Google's computers store thumbnail versions of Perfect 10's copyrighted images and communicate copies of those thumbnails to Google's users. Therefore, Perfect 10 has made a prima facie case that Google's communication of its stored thumbnail images directly infringes Perfect 10's display right.

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1160 (9th Cir. 2007). Although there are important differences between Defendant's service and that of Google in the *Perfect 10* case – differences that only underscore Defendant's liability here, as discussed below – in both cases the defendants' "computers store thumbnail versions of … copyrighted images and communicate copies of those thumbnails to [their] users." *Id.* Defendant's violation of the display right in this context, therefore, is abundantly clear.

When the Bing Image Widget is set to "slideshow" view, Defendant does not populate the display panel with images that reside its own servers, but instead directs the user's browser (invisibly) to download and display the larger-sized images from third-party websites that host them. While this technical difference from the "collage" view is immaterial to the user's experience – in both cases, the user is unaware of the location of the image and sees the image only as being displayed through a Bing-branded window – Defendant can be expected to argue that this under-the-hood quirk of computer engineering means that the third-party source website, rather than Defendant, displays the images when the Bing Image Widget is in "slideshow" view (Defendant, of course, has no such argument as to the "collage" view).

This sort of argument-from-engineering-loophole, however, is irreconcilable with the Supreme Court's recent decision in *American Broadcasting Cos. v. Aereo, Inc.*, 134 S. Ct. 2498 (2014). In *Aereo*, Internet-based retransmitters of over-the-air television signals argued that they did not "perform the copyrighted work publicly" because each transmission technically came from a miniature antenna assigned to each user and, therefore, those transmissions were "private" rather than "public" performances. *Id.* at 2504, 2507-08. The Court rejected the argument, noting that the technical difference

12

"means nothing to the subscriber. It means nothing to the broadcaster. We do not see how this single difference, invisible to subscriber and broadcaster alike, could transform a system" from infringing to non-infringing. *Id.* at 2507.

Here, as in *Aereo*, the technical differences between the location of the image in the "collage" and "slideshow" views are irrelevant (and invisible) to both users and content owners, and it is only by Defendant's design and direction that images in "slideshow" view are retrieved from a third-party source rather than from Defendant's own servers. In both the "collage" and "slideshow" views, the user experiences only a display via the Bing Image Widget, and in both instances the misappropriation of the copyrighted image is damaging to the copyright owner. As the *Aereo* decision teaches, it is this practical, functional perspective rather than technical gimmickry that should govern whether a particular mode of content delivery is infringing or not.

Nevertheless, Defendant will likely argue for a different approach – namely, the so-called "server test" adopted by the Ninth Circuit in *Perfect 10*. There, the Ninth Circuit held that Google Image Search pages that merely directed the display of infringing images stored on third-party sites did not satisfy this test "[b]ecause Google's computers do not store the photographic images." 508 F.3d at 1160. *Perfect 10*, however, is distinguishable on its facts, is not binding law in this Circuit and, in any event, was decided several years before the Supreme Court's decision in the *Aereo* case, which rejected the very sort of technical distinctions that underpinned the "server test."

The technology at issue in *Perfect 10* was that of a search engine functioning as such, which clearly influenced the court's adoption of the "server test." *See Perfect 10*, 416 F. Supp. 2d at 844 ("Merely to index the web so that users can more readily find the

13

information they seek should not constitute direct infringement . . . ."). Here, as explained, the Bing Image Widget is neither functioning nor promoted as a search engine that directs users to other locations on the Internet – to the contrary, it is a means of providing content for the purpose of encouraging users to remain on a given website and, ultimately, to enter Defendant's own universe of websites. In other words, the Bing Image Widget operates as a direct substitute for the licensed uses of Plaintiff's content. Whatever logic the "server test" may have had on the facts of *Perfect 10*, it makes no sense here. Accordingly, Defendant's conduct, through the Bing Image Widget, is properly regarded as an infringing public display of Plaintiff's copyrighted images.

**B.     Defendant's Infringement Cannot Be Excused As Fair Use**

Defendant will likely argue that its infringement of both the reproduction and display rights should be excused as fair use. Because "fair use is an affirmative defense, the burden of proof rests" with Defendant. *Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 550 (S.D.N.Y. 2013); *see Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 107 (2d Cir. 1998). Defendant cannot carry that burden.

In assessing fair use, courts consider four factors:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107; *see Meltwater*, 931 F. Supp. 2d at 550. Here, all four factors weigh heavily against fair use, as shown below.

14

Because the "purpose and character of" Defendant's use of copyrighted imagery through the Bing Image Widget is undeniably commercial in nature, the first of these factors weighs heavily against fair use. Defendant derives significant economic value from the fact that clicking an image in the Bing Image Widget display panel takes the user not to the third-party source website, but instead to Defendant's own website. Drawing users to its own universe of websites and maximizing the time that users remain there allows Defendant to derive valuable data about those users and increases the value of Defendant's websites for advertising purposes, among others. Indeed, Defendant has expressly reserved the right to charge direct fees for the use of the Bing Image Widget and to further monetize the service by placing advertisements in the Bing results in the display panel. Compl. ¶ 29 & Ex. B. The law is clear that "'when the copier directly and exclusively acquires conspicuous financial rewards from its use of the copyrighted material' a finding of fair use is less likely." *Meltwater*, 931 F. Supp. 2d at 552 (quoting *Blanch v. Koons,* 467 F.3d 244, 253 (2d Cir. 2006)).

Neither is Defendant's use of images "transformative"—to the contrary, Defendant merely copies and displays the copyrighted images essentially as they appear on the Internet more generally. Miyashita Decl. ¶ 10. A "use of copyrighted material that merely repackages or republishes the original is unlikely to be deemed a fair use." *Infinity Broadcast*, 150 F.3d at 108; *see Meltwater*, 931 F. Supp. 2d at 551.

Indeed, the Bing Image Widget serves essentially the same purpose as does Plaintiff through its protected images, and so seeks to "supersede[] the objects of the original creation." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994) (internal quotation marks omitted). Plaintiff's core business, as noted above, is licensing its industry-leading visual content to websites (among others). Miyashita Decl. ¶ 4. Defendant's stated goal is much the

15

same—to provide content to website publishers that will draw users to their websites and, ultimately, to Defendant's own universe of websites. Because "the underlying purpose of [Defendant's] use is the same as [Plaintiff's] original purpose," its use cannot be transformative. *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 101 (2d Cir. 2014); *see Marcus v. Rowley*, 695 F.2d 1171, 1175 (9th Cir. 1983) ("[A] finding that the alleged infringers copied the material to use it for the same intrinsic purpose for which the copyright owner intended it to be used is strong indicia of no fair use.").

The second and third factors so flatly disfavor a finding of fair use that they require little discussion. As to the "nature of the . . . work," Plaintiff's distinctive images are "expressive [and] creative" works of photographic expression, and thus at the "core of intended copyright protection." *Cariou v. Prince*, 714 F.3d 694, 709 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 618 (2013). And Defendant, through the Bing Image Widget, takes *all* of these images, reproducing and displaying them in their entirety. "[G]enerally, it may not constitute a fair use if the entire work is reproduced." *Infinity Broad.*, 150 F.3d at 109 (quotation marks omitted).

The last factor—the effect on "the potential market for or value of" Plaintiff's copyrighted works—shows even more clearly the fundamental unfairness of Defendant's use. This factor "is aimed at the copier who attempts to usurp the demand for the original work," *Consumers Union of U.S., Inc. v. Gen. Signal Corp.*, 724 F.2d 1044, 1050 (2d Cir. 1983), which is precisely what Defendant has done here.

As noted, Plaintiff's core business is licensing its images to website publishers (among others) so they can lawfully use those images on their sites. Miyashita Decl. ¶ 4. Plaintiff has also developed its own "Embed" tool, which allows users (for free) to embed Plaintiff's copyrighted images on websites, blogs, and social media sites for noncommercial purposes. This

tool carries Plaintiff's trademark, includes attribution for photographers, and provides for easy sharing of images via Facebook, Twitter, and the like—all of which helps build Plaintiff's brand. *See* Aul Decl., Ex. D.  A click on the image takes the user to Plaintiff's website, which permits the user to license the image for commercial use.  Miyashita Decl. ¶ 6 & Attachments B, C.

Through the Bing Image Widget, Defendant uses Plaintiff's copyrighted images to "directly compete[] with" Plaintiff's own services, thereby undermining the market for, and value of, Plaintiff's copyrights.  *Meltwater*, 931 F. Supp 2d at 561.  Without any permission whatsoever, Defendant uses Plaintiff's protected images in precisely the same manner as Plaintiff seeks to license them, all but eliminating the incentives of website publishers to seek licenses from Plaintiff.  Miyashita Decl. ¶ 13.  Because the Bing Image Widget thus attempts to "usurp[] or substitute[] for the market of [Getty's] original work," Defendant's use is not fair. *Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.*, 150 F.3d 132, 145 (2d Cir. 1998).

Indeed, the Bing Image Widget competes directly with Plaintiff's own "Embed" tool, and functions in much the same way.  When the Bing Image Widget displays one of Plaintiff's images, the user sees only Bing's logo—not that of Getty Images, as he or she would through Plaintiff's "Embed" tool.  Miyashita Decl. ¶ 14.  Absent action by the user, the Bing Image Widget displays no information at all to suggest that the images come from anyone other than Defendant, thereby depriving Plaintiff of all of the brand-building benefits and monetization opportunities it would otherwise receive through use of its "Embed" tool, and instead misappropriating those benefits for Defendant.  Miyashita Decl. ¶¶ 11, 14.  In this respect, Defendant disconnects Plaintiff from existing users and prospective licensees of its images, inserting itself as the brand-name image provider.  Miyashita Decl. ¶ 14.

17

Defendant will no doubt argue that none of this unfairness matters. Bing is a search engine, Defendant will say, and the creation and display of reduced-size "thumbnail" images in connection with a search engine was held to be a "transformative" (and thus fair) use in *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007). There, the Ninth Circuit concluded that a search engine's creation and display of reduced-size, low resolution thumbnails of copyrighted images was fair use because "a search engine transforms the image into a pointer directing a user to a source of information" and thus "serves a different function than the original work." *Id.* at 1165.

But this case is not about Bing Image Search or, for that matter, any other search engine, to the extent that it creates and displays low-resolution, thumbnail-sized images that, when clicked, lead directly to an image in the context of the source website. Instead, it is about the Bing Image Widget, which, unlike a search engine, does not function as "a pointer directing a user to a source of information," but rather functions as a substitute for the exact same content that Plaintiff offers for licensing for the exact same use. Defendant does not operate the Bing Image Widget as a search engine, but rather as a means of providing content to websites – albeit content that Defendant has no right to provide.

The mere fact that Defendant's service makes use of image-search functionality does not immunize Defendant. Indeed, in *Associated Press v. Meltwater*, this Court rejected a nearly identical attempt to create such a "search engine immunity." In *Meltwater*, the defendant used search-engine functionality to provide excerpts of copyrighted news articles to its users and claimed that, as a search engine, its use was fair under the Ninth Circuit's reasoning in *Perfect 10*. 931 F. Supp. 2d at 541, 544. This Court disagreed, explaining that "using the mechanics of search engines to scrape material from the Internet and provide it" to users does not render a use

18

transformative or fair, and that cases like *Perfect 10* do "not relieve [a defendant] of its independent burden to prove that its specific display . . . qualifies as a fair use." *Id.* at 556.

Instead, the *sine qua non* of the fair use recognized in *Perfect 10* is that the service's function must be "to serve as a pointer to a source of information rather than serving as a form of entertainment" or content itself. *Id.* at 555. That is, to be transformative (and thus fair), the use in question must be "to allow users to sift through the deluge of data available through the Internet and to direct them to the original source." *Id.* at 556. This is the opposite of what the Bing Image Widget does.

The Bing Image Widget might make use of information and content created by Defendant's search engine, but the Widget itself is not about search. Its purpose instead is to offer to websites "beautiful, configurable image galleries and slideshows"—and to entice users into Defendant's family of websites. In these circumstances, cases like *Perfect 10* are far off point, and "fair use" cannot excuse Defendant's infringing conduct.

## II.   Injunctive Relief Is Necessary To Prevent Irreparable Harm.

In the absence of a preliminary injunction, Getty Images faces the immediate prospect of immense and irreparable harm. Although still in its earliest days of release, the Bing Image Widget has already been implemented by websites around the world. Miyashita Decl. ¶ 17. Absent interim relief, Defendant will continue and broaden the infringement of Plaintiff's copyrights through the Bing Image Widget. "A plaintiff has no adequate remedy at law where, absent an injunction, the defendant is likely to continue infringing its copyright(s)." *Complex Sys., Inc. v. ABN AMRO Bank N.V.*, No. 08-cv-7497, 2014 WL 1883474, at *11 (S.D.N.Y. May 9, 2014) (quoting *Hounddog Prods., L.L.C. v. Empire Film Grp., Inc.*, 826 F. Supp. 2d 619, 634 (S.D.N.Y. 2011)).

Indeed, the injuries to Plaintiff's business that are threatened here are quintessentially irreparable. Harm is irreparable when it threatens "the loss of a relationship with [customers] that would produce an indeterminate amount of business in years to come." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999). Here, Plaintiff's business depends critically on licensing to others the right to use its images. If website publishers can instead obtain from Defendant a virtually limitless collection of online images for display on their websites for free and without restriction, they will have little or no incentive to license such uses of copyrighted images from Getty Images. Miyashita Decl. ¶¶ 4-5, 13. Defendant's Bing Image Widget thus destroys Plaintiff's actual and potential relationships, engages in "direct competition" with Plaintiff's licensed products, *Complex Sys.*, 2014 WL 1883474 at *12, and threatens to undermine Plaintiff's "current [and] future market share," *Grand River Enterprise Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 67 (2d Cir. 2007). These are classic irreparable harms. *See Ticor Title*, 173 F.3d at 69; *Complex Sys.*, 2014 WL 1883474 at *12; *Grand River*, 481 F.3d at 67.

Moreover, when the Bing Image Widget identifies Defendant's own brand with Plaintiff's protected content – as happens when Plaintiffs' images appear in the Bing-branded display panel – Defendant misappropriates the customer goodwill that Plaintiff has created through years of industry-leading innovations in licensing high-quality content, including its own "Embed" tool. Miyashita Decl. ¶ 14. "Prospective loss of this goodwill alone is sufficient to support a finding of irreparable harm." *N.Y. City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 343 (S.D.N.Y. 2010).

The monetary damages caused by Defendant's conduct are impossible to calculate. "[I]rreparable harm may be found where damages are difficult to establish and measure." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004). Given the scale of

Defendant's conduct—which could result in the display of millions of Plaintiff's protected images across millions of different websites—the damages from even its *direct* consequences will be incalculable. But because Defendant supplies images to the Bing Image Widget with no controls on their downstream use, Defendant's conduct also leaves users free to copy and further distribute Plaintiff's images in ways that cause additional, and incalculable, damages. Miyashita Decl. ¶ 15.

### III.   The Balance of Hardships Favors Plaintiff, and Injunctive Relief Furthers the Public Interest.

Plaintiff has established "both a likelihood of success on the merits and irreparable harm," and injunctive relief is necessary to protect Plaintiff against all of the harms identified above—harms that go to the very core of Plaintiff's business. *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 287 (2d Cir. 2012), *cert denied*, 133 S. Ct. 1585 (2013). The balance of hardships therefore heavily favors the issuance of immediate injunctive relief.

Defendant, for its part, would suffer no cognizable harm from an injunction. Although an injunction would prevent Defendant from using the Bing Image Widget to infringe the copyrights of Plaintiff and others, "an infringer of copyright cannot complain about the loss of ability to offer its infringing product." *Id.* (quotation marks omitted); *see also CJ Prods. LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 146 (E.D.N.Y. 2011) ("[O]ne who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected"). This is particularly true here, because an injunction would affect only a tiny slice of the Bing service offerings—much less of Microsoft as a whole. *See CJ Prods.*, 809 F. Supp. 2d at 146 ("Defendants' business will not be severely impacted, as they have an extensive array of non-infringing products that they may

continue selling."). Indeed, the injunctive relief sought here is narrow, forbidding only the infringing service that Defendant introduced less than two weeks ago.[6]

The public interest, far from being "disserved by the issuance of a preliminary injunction," likewise supports the relief sought here. *Salinger*, 607 F.3d at 80 (internal quotation marks omitted).[7] "[T]he public has a compelling interest in protecting copyright owners' marketable rights to their work and the economic incentive to continue creating" those works. *WPIX*, 691 F.3d at 287. That is because "[i]nadequate protections for copyright owners can threaten the very store of knowledge to be accessed; encouraging the production of creative work thus ultimately serves the public's interest in promoting the accessibility of such works." *Id.*

These principles apply with special force here, given Plaintiff's role as the world's leading provider of commercial images online. Miyashita Decl. ¶ 3; *see WPIX*, 691 F.3d at 288 (emphasizing that "Plaintiffs are copyright owners of some of the world's most recognized and valuable television programming. Plaintiffs' television programming provides a valuable service to the public, including, *inter alia,* educational, historic, and cultural programming, entertainment, an important source of local news critical for an informed electorate, and exposure to the arts."). Moreover, the "public will still be able to access" Plaintiff's images "through means other than" the Bing Image Widget. *WPIX*, 691 F.3d at 288. In particular, the

---

[6] For these same reasons, the balance of hardships "tip[s] decidedly" in Plaintiff's favor, and thus it would be entitled to injunctive relief even if it had shown only a "fair ground for litigation." *Christian Louboutin*, 696 F.3d at 215.

[7] "The 'public interest' prong does not mean that a court must consider the public interest in deciding *whether* to grant injunctive relief; rather, it means that if injunctive relief is granted, a court should ensure that the injunctive provisions of the order do not harm the public interest." *Briggs & Stratton*, 2013 WL 3972391 at *1 n.4; *see Citigroup*, 673 F.3d at 163 n.1. Regardless, for the reasons stated herein, the public interest strongly supports injunctive relief.