## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

GETTY IMAGES (US), INC.,

      Plaintiff,

  v.

MICROSOFT CORPORATION,

      Defendant.

Civ. No. 14-cv-7114-JFK

## MICROSOFT CORPORATION'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

PAGE

INTRODUCTION ........................................................................................................ 1

FACTS ....................................................................................................................... 3

    A. BING IMAGE SEARCH ................................................................................ 3

    B. MICROSOFT'S IMAGE WIDGET ................................................................ 5

        1. How Collage Works In The Widget ................................................... 7

        2. How SlideShow Works in the Widget ................................................ 8

    C. FOR YEARS, THERE HAVE BEEN MANY OTHER WAYS OF
       ACCOMPLISHING WHAT THE WIDGET DOES .................................... 10

    D. MICROSOFT HAS A BUSINESS RELATIONSHIP WITH GETTY ..................... 10

ARGUMENT ............................................................................................................. 10

    I. GETTY IS NOT LIKELY TO SUCCEED BECAUSE IT HAS NOT IDENTIFIED
      ANY
      SPECIFIC COPYRIGHTED WORKS THAT HAVE BEEN INFRINGED ........... 11

    II. GETTY IS NOT LIKELY TO SUCCEED BECAUSE THE CREATION OF THE
       THUMBNAIL LIBRARY IS FAIR USE ................................................. 13

    III. GETTY IS NOT LIKELY TO SUCCEED BECAUSE THE WIDGET NEITHER
        COPIES NOR DISPLAYS ANY COPYRIGHTED WORKS ............................ 15

    IV. GETTY IS NOT LIKELY TO SUCCEED ON DIRECT INFRINGEMENT
        BECAUSE MICROSOFT IS NOT THE VOLITIONAL ACTOR ....................... 17

        A. The User—Not Microsoft—Is The Volitional Actor ........................... 18

    V. THE COURT SHOULD DENY THE INJUNCTION BECAUSE GETTY HAS
       PROVIDED NO EVIDENCE OF HARM, LET ALONE IRREPARABLE
       HARM ................................................................................................. 20

        A. There Is No Present Harm Because There Is No Evidence (Or Allegation) That
          The Copyrighted Images Have Been, Or Will Be, Used With The Widget ........ 21

        B. Even If A Website Developer Accessed The Copyrighted Images Using The
          Widget, Getty's Conclusory Assertions Do Not Demonstrate Harm ................... 21

i

C.  There Is No Harm Where Defendant's Actions Have No Detectable Effect ....... 23

D.  Even If The Copyrighted Images Are Used With The Widget, And Such Use Causes Harm To Getty, The Harm Is Not Irreparable .......................................... 23

VI. THE BALANCE OF HARDSHIPS DOES NOT TIP IN GETTY'S FAVOR .......... 24

VII.AN INJUNCTION IS NOT IN THE PUBLIC INTEREST....................................... 25

CONCLUSION..................................................................................................................... 26

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*American Broadcasting Cos. v. Aereo, Inc.*,
   134 S.Ct. 2498 (2014) ...................................................................................16, 18

*Appalseed Productions, Inc. v. MediaNet Digital, Inc.*,
   No. 11 Civ. 5922, 2012 WL 2700383 (S.D.N.Y. July 6, 2012) ...............................20

*Apple, Inc. v. Samsung Elecs. Co., Ltd.*,
   735 F.3d 1352 (Fed. Cir. 2013) ...................................................................24

*Ascentive, LLC v. Opinion Corp.*,
   842 F. Supp. 2d 450 (E.D.N.Y. 2011) .............................................................12

*Associated Press v. Meltwater*,
   931 F. Supp. 2d 537 (S.D.N.Y. 2013) .............................................................13

*Authors Guild, Inc. v. Google, Inc.*,
   954 F. Supp. 2d 282 (S.D.N.Y. 2013) .............................................................13

*Broadcast Music, Inc. v. Pamdh Enters., Inc.*,
   No. 13-CV-2255, 2014 WL 2781846 (S.D.N.Y. June 19, 2014) ............................24

*Buffalo Forge Co. v. Ampco–Pittsburgh Corp.*,
   638 F.2d 568 (2d Cir. 1981).........................................................................24

*Cartoon Network v. CSC Holdings, Inc.*,
   536 F.3d 121 (2008)..............................................................................16, 18

*CoStar Group, Inc. v. LoopNet, Inc.*,
   373 F.3d 544 (4th Cir. 2004) ........................................................................18

*Disney Enters., Inc. v. Hotfile Corp.*,
   798 F. Supp. 2d 1303 (S.D. Fla. 2011) .............................................................19

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006)..................................................................................11

*Esbin & Alter, LLP v. Sabharwal, Globus, & Lim, LLP*,
   403 Fed.Appx. 591 (2d Cir. 2010) ..................................................................21

*Fox Broad. Co. v. Dish Network LLC*,
   747 F.3d 1060 (9th Cir. 2014) ...................................................................18, 19

iii

*Fox News Network, LLC, v. TVEyes, Inc.,*
   13 Civ. 5315, slip op. (S.D.N.Y. Sept. 9, 2014) ..................................................13

*Jayaraj v. Scappini,*
   66 F.3d 36 (2d Cir. 1995) ....................................................................................22

*JSG Trading Corp. v. Tray-Wrap, Inc.,*
   917 F.2d 75 (2d Cir. 1990)...................................................................................10

*Kelly v. Arriba Soft,*
   336 F.3d 811 (9th Cir. 2003) ...............................................................................13

*Klein v. City of New York,*
   No. 10 Civ. 9568, 2011 WL 5248169 (S.D.N.Y. Oct. 28, 2011) .........................12

*Marvullo v. Gruner & Jahr,*
   105 F. Supp. 2d 225 (S.D.N.Y. 2000)..................................................................11

*Mathew Bender & Co. v. West Publ'g Co.,*
   158 F.3d 693 (2d Cir. 1998)................................................................................17

*Munaf v. Geren,*
   553 U.S. 674 (2008)............................................................................................10

*N.Y. City Triathlon, LLC v. NYC Triathlon Club, Inc.,*
   704 F. Supp. 2d 305 (S.D.N.Y. 2010)..................................................................22

*Palmer Kane LLC v. Scholastic Corp.,*
   No. 12 Civ. 3890, 2014 WL 1303135 (S.D.N.Y. Mar. 31, 2014) .........................11

*Pan American World Airways, Inc. v. Flight 001, Inc.,*
   No. 06 Civ. 14442, 2007 WL 2040588 (S.D.N.Y. July 13, 2007) ........................20

*Perfect 10, Inc. v. Google, Inc.,*
   653 F.3d 976 (9th Cir. 2011) ...............................................................................23

*Perfect 10 v. Amazon,*
   508 F.3d 1146 (9th Cir. 2007) ................................................................... *passim*

*Psihoyos v. John Wiley & Sons, Inc.,*
   No. 11 Civ. 1416, 2011 WL 4634172 (S.D.N.Y. Oct. 4, 2011) ...........................24

*Religious Technology Center v. Netcom On-Line Comm. Svcs., Inc.,*
   907 F. Supp. 1361 (N.D. Cal. 1995).....................................................................18

*Rex Med. L.P. v. Angiotech Pharms. (US), Inc.,*
   754 F. Supp. 2d 616 (S.D.N.Y. 2010)...................................................................20

*Salinger v. Colting*,
  607 F.3d 68 (2d Cir. 2010)...................................................................11, 20, 21, 23

*Sharp v. Patterson*,
  No. 03 Civ. 8772, 2004 WL 2480426 (S.D.N.Y. Nov. 3, 2004)...............................11

*Stokely-Van Camp, Inc. v. Coca-Cola Company*,
  646 F. Supp. 2d 510 (S.D.N.Y. 2009).......................................................................20

*Uni-World Capital L.P v. Preferred Fragrance, Inc.*,
  No. 13 Civ. 7204, 2014 WL 3417281 (S.D.N.Y. July 10, 2014) ............................22

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008).......................................................................................................10

*Wolk v. Kodak Imaging Network, Inc.*,
  840 F. Supp. 2d 724 (S.D.N.Y. 2012).......................................................................19

**Statutes**

17 U.S.C. § 106...............................................................................................................2

17 U.S.C. § 107.............................................................................................................25

17 U.S.C. § 512.......................................................................................................13, 16

**Other Authorities**

W. Patry, Copyright § 19:3 (2013)................................................................................11

## INTRODUCTION

Microsoft Corporation ("Microsoft") opposes the motion filed by Getty Images (US), Inc. ("Getty") to preliminarily enjoin the Image Widget tool ("Widget").  Getty claims that Microsoft directly infringes Getty's copyrights when third-party website developers use the Widget to display Bing Image Search results on their websites, either as a series of images ("Slideshow") or as one of a series of smaller images compiled in a single window ("Collage").  Getty is wrong.

The Widget is a tool that helps website developers link to Microsoft Bing Image Search results and display those results on sections of their third-party websites.  The search functionality upon which the Widget relies has existed for years, both via Microsoft's image search engine as well as numerous other image search engines, including Google.  The Widget just makes it easier for a website developer to program his own website to display image search results.  The purpose is to enhance a website user's ability to explore a topic more fully through displayed search results, and to facilitate and encourage exploration, comment and criticism.

In filing this lawsuit and moving for a preliminary injunction (particularly on the schedule requested), Getty asks this Court to reach a snap decision without the benefit of actual (or accurate) facts.  Microsoft made its Widget available in test or "beta" form just two weeks ago so that website developers could experiment with the technology and, as appropriate, provide feedback.  As Getty admits in its moving papers, Getty only learned of the launch of the Widget a week-and-a-half before filing this lawsuit.  During that time, notwithstanding the fact that Getty and Microsoft have an ongoing business relationship, Getty did not contact Microsoft to inquire about how the Widget works, how it is used, or even to register any specific concerns that might have been addressed.  Instead, Getty filed this lawsuit and preliminary injunction motion, asking the Court to order Microsoft to respond within two business days.

1

Getty's tactics can only be understood in light of the weakness of its claims.  Haste is necessary for Getty to prevail because any reasoned consideration of the matter based on a full understanding of the facts would result not only in Getty's motion for a preliminary injunction being denied, but in its Complaint being dismissed.  Stripped of their overblown rhetoric, Getty's arguments have no substance, and its motion for a preliminary injunction should fail.

Getty is unlikely to succeed on the merits for numerous reasons.  First, Getty has neither alleged nor offered evidence that a single one of the 50 images identified in the Complaint (the "Getty Images") has actually been copied or displayed by any website developer using the Widget.[1]  This flaw in Getty's pleading is fatal, and dooms its request for the extraordinary remedy of a preliminary injunction.  Second, even if Getty could identify an unauthorized use, the operation of the Widget is a permissible fair use.  Third, Microsoft cannot be liable because its Widget never actually copies or displays any copyrighted works.  The only information the Widget ever supplies to the third-party user's website is an HTML address pointing to where the images are located, not the images themselves.  Fourth, Microsoft cannot be ***directly*** liable for any potentially resulting infringement because Microsoft is not the one "doing" the alleged infringing acts; it just provides a tool used by website publishers.  Thus, Microsoft can only be ***indirectly*** liable, and Getty asserts no indirect claims in its preliminary injunction motion.

In addition to the merits issues, a preliminary injunction should not enter because Getty cannot show that it is likely to suffer any existing or impending irreparable harm, and the public interests tip decidedly against a preliminary injunction.  This is particularly true since Microsoft

---

[1] Although Getty asserts additional claims in its Complaint, its motion for a preliminary injunction is limited to direct infringement claims under 17 U.S.C. § 106(1) and (5), *i.e.*, "reproduction" and "display."  Mem. of Law in Support of Order to Show Cause, No. 14-Civ-7114-JFK, Dkt. No. 6 (Sept. 5, 2014) ("Mem.") at 10.

voluntarily disabled the Widget a day after learning of Getty's claims and subsequently agreed to implement a change to use only licensed images until a decision has been rendered in this case. Microsoft intends to re-launch the Widget only in this modified form.  As a result of these changes, any claimed irreparable harm is baseless.[2]

For these reasons, and those set for the below, the Court should deny Getty's motion.

## FACTS

### A.   BING IMAGE SEARCH

Microsoft's Bing Internet search engine (accessible at www.Bing.com) allows users to search for content across the Internet, including both text and images.  Declaration of Gautam Vaidya ("Vaidya Decl.") at ¶ 9.  Like other search engines, Bing uses automated tools to "crawl" the Internet for content.  *Id*. at ¶ 10.  Bing continuously analyzes web pages and images that it has "crawled," and uses its proprietary data and algorithms to select a subset of content to be stored and indexed for searching.  *Id*. at ¶ 11.  When the user enters a search term into the Bing search box, Bing's software searches its index for websites containing terms relevant to the user's search query.  *Id*. at ¶ 12.  The user is then provided with a list of results from that search on a results page.  *Id*.

The user can also use Bing to search for images (as opposed to targeting mostly textual works) specifically by using the Bing Image Search (www.bing.com/images).  *Id*. at ¶ 13.  When Bing indexes webpages or websites containing images, it stores the webpages and single copies

---

[2] Given that Microsoft intends to modify the Widget so that during the pendency of this case it can only be used by website developers to access images that are in the public domain, subject to Creative Commons licenses, or otherwise licensed, Microsoft wrote to Getty and asked that it withdraw its motion for a preliminary injunction.  *See* Declaration of R. David Hosp ("Hosp Decl."), Exh. 1 (9/9/14 letter from Microsoft to Getty).  Getty refused and insisted on proceeding with its motion.  *Id.*, Exh. 2 (9/10/14 letter from Getty to Microsoft).  Microsoft reserves the right to seek costs and attorneys' fees related to responding to the motion.

of the indexed images as reduced-sized, lower-resolution files ("Thumbnails") on its servers ("Thumbnail Library").[3]  *Id.*  If the image contains a watermark, copyright, or other attribution, that is retained in the stored Thumbnail.  *Id.* at ¶ 16.  When the user enters a search query into Bing Image Search, the search index returns the list of results with references to where the Thumbnails can be found in the Thumbnail Library, and the user's web browser is instructed to retrieve the Thumbnails.  *Id.* at ¶ 17.  When the user hovers over the Thumbnail with his cursor, the user is provided with information concerning the underlying image that the Thumbnail represents, including the "description" (*e.g.*, file name, page title, alt text) associated with the image and the image domain (web address) for the source website where the original image is located (the "Image Host Site"). *Id.* at ¶ 18.  An example of a Bing Image Search results page for the query "empire state building" is shown with the cursor hovering over one of the Thumbnails.



        If the user clicks on a Thumbnail, he is directed to a full-size version of the image originating directly from a third-party website on which the third party originally posted the image (the "Image Detail View").  *Id.* at ¶ 19.  Bing provides HTML code that directs the user's Internet browser to communicate with the Image Host Site server.  *Id.* at ¶ 21.  It is the third-

---

[3] Indexing images and storing Thumbnails are practices common to and required to enable image search, and thus are used by other search engines, such as Google.  Vaidya Decl. at ¶ 15.

party server, not Bing, which provides the image to the user in an "in-line" link. *Id*. Thus, the

Image Host Site servers cause the image to be displayed within the Bing Image Search results

page, rather than taking the user directly to the webpage that hosts the image. *Id*. If the user

then clicks on the image, the user is taken to the Image Host Site. *Id*. The creation of

Thumbnails and the Thumbnail Library is a function of Bing's Internet search engine, and more

particularly, its Bing Image Search function—not of the Widget beta functionality as described

below. *Id*. at ¶ 22. The Thumbnail Library has existed since at least 2006, and it exists to

facilitate Bing Image Search's core Internet search engine function. *Id*. at ¶¶ 14, 22.

**B.    MICROSOFT'S IMAGE WIDGET**

On August 21, 2014, Microsoft launched a "beta" or test version of its Widget free of

charge to the public at www.bing.com/widget/image. *Id*. at ¶ 24.[4] The Widget aids website

developers who wish to display Bing Image Search results on their own websites (each a "Web

Developer's Website"), and provide links to additional information about the Bing Image Search

results. *Id*. at ¶ 23. The Widget allows website developers to select search queries and display

the Bing Image Search results just as they are seen on Bing.com to educate and inform visitors to

the Web Developer's Website. *Id*. at ¶ 25. The Widget does not provide search functionality

directly; it simply helps automate the coding that the website developer could otherwise do

himself in order to display image search results on his websites if the Widget did not exist. *Id*. at

¶ 26 The Widget just makes that integration of such code easier for the website developer. *Id*.

If a website developer chooses to use the Widget, he first goes to the Webmaster Portal.

*Id*. at ¶ 27. There, he makes selections to design customized Bing Image Search Results. *Id*.

The website developer determines what query to run; he tells Bing Image Search what images he

---

[4] Microsoft has not yet released a final version.

wants to find.  *Id*.  The query may be broad—"Empire State Building"—or more narrow—"Empire State Building at night full moon in winter."  The website developer decides, and Bing does not instruct users on how to construct their queries; the selection is entirely up to the user.  *Id*.  The results provided by Bing are its "normal" search results (i.e., the same images the user would see after running a search directly on http://www.bing.com/images/).  *Id*. at ¶ 28.

The website developer can select whether he would like to display the search results as either a "Collage" or a "Slideshow."  *Id*. at ¶ 29.  The website developer then chooses the number of images, size of the Widget, the background color against which the images will be set, the borders surrounding the images, the spacing between the images, and any limitations on location or language.  *Id*. at ¶ 30.  Once these selections are made, the website developer reviews a "Preview" of the Widget he has created, and can make changes to his query or previously-selected display options.  *Id*. at ¶ 31.  If the developer is satisfied with the results, he is provided a small portion of source code that he implements into the source code for the website he is designing.  *Id*. at ¶ 32.  By choosing to insert that code into his website, the website developer directs his website to display the Bing Image Search results he has created.  *Id*. at ¶ 33.  That source code instructs the user's browser to render the Widget using the Bing Image Search Results.  *Id*.  The Bing Image Search results return references to the Thumbnail Library (for Collage), or the Image Host Site (for Slideshow).  *Id*.  The user viewing the Web Developer's Website thus sees the Bing Image Search results displayed there.  *Id*.  The Widget makes no copy of any image.  *Id*.

### 1.    How Collage Works In The Widget

If the website developer wants the Bing Image Search results displayed in a single view containing multiple Thumbnails, he selects Collage.  *Id*. at ¶ 34.  After making this selection, the

website developer can change the size of the Collage, the thickness of the borders, the space between the images, and the number of images to display.  *Id*. at ¶ 35.  However, the website developer cannot change the size of the Thumbnails, which are never any larger than they appear in standard Bing Image Search results.  *Id*. at ¶ 36.  Below is a sample of a Collage for the query, "Empire State Building."  If the website developer includes the source code for the Collage in his webpage, he would display the following image:



The Widget makes no copies of the images when the Collage is generated.  *Id*. at ¶ 37. The images in the collage are sourced from the existing Thumbnail Library generated from the Bing Image Search results.  *Id*. at ¶ 38.  The images appear in the same order in the Collage as in the subset of the Thumbnail Library retrieved in response to a Bing Image Search.  *See* Hosp Decl., Exh. 3 (photo comparison between Collage and Bing Image Search results); *id*. at ¶ 39.

In both the Preview available to the website developer on the Webmaster Portal and the Collage presented to an individual viewing the Web Developer's Website, to view the full image and the associated information about the image, the user follows the same steps as it would with a Bing Image Search.  *Id*. at ¶ 41.  If the user viewing the Web Developer's Website hovers over any of the Thumbnails with his cursor, the address for the Image Host Site appears.  *Id.* at ¶ 42. If the user decides to click on one of the images in the Collage, the user is taken to the Bing Image Search results page, where the user is then again presented with the particular search

query that produced the image result. *Id.* at ¶ 43.  There, he can view information concerning the source of the image and can click through to obtain the full image on the original source website. *Id.* at ¶ 43.  If the original image contains a watermark, copyright, or other attribution, that marking is present on the Thumbnail in both the Collage and the Bing Image Search results page. *Id.* at ¶ 44.  The border of the Collage identifies the information as linked to the Bing Internet search engine; when the user hovers over the Bing logo with his cursor, the user is invited to "see more images" resulting from that particular search query.  *Id.* at ¶ 45.  If the user clicks on the Bing logo, he is taken to the Bing Image Search Results page.  *Id.*

    **2.   How SlideShow Works in the Widget**

If the website developer wants the Bing Image Search results to scroll across a window one image at a time, he selects Slideshow when customizing the Widget in the Webmaster Portal.  *Id.* at ¶ 46.  In Slideshow mode, the scrolling Bing Image Search results are images linked directly to the Image Host Sites.  *Id.* at ¶ 47.  To display search results in Slideshow, as with Collage, a website developer enters a query on the Webmaster Portal page.  *Id.* at ¶ 48.  The website developer selects the number of images he would like to include (up to 25), which determines the number of images the Widget will display.  *Id.* at ¶ 49.  As shown below, the images are displayed one at a time and advance automatically, but can be paused or advanced backward or forward by the user.  *Id.* at ¶ 50.

  

This is the same Slideshow view that is available from the Image Host Sites (through the Bing Image Detail View) which would result from the user running a search for images directly from the Bing Internet search engine. *Id.* The images the website developer chooses to display in the Slideshow do not originate from Bing's servers. *Id.* at ¶ 51. Instead, the images are displayed via direct in-line links to the Image Host Site's images, just as when viewing results through the Image Detail View in the Bing Internet search engine. *Id.* Bing's servers do not host the original images, and no copy is made or used in connection with the Slideshow view. *Id.* at ¶52. Bing provides HTML code that can be incorporated into the Web Developer's Website to direct the Internet browser of the user viewing the Web Developer's Website to the source of the image. *Id.* at ¶ 53. In Slideshow, like Collage, when the user clicks on one of the displayed images, the user is then taken to the Bing Image Search results page, with the selected picture appearing first. *Id.* at ¶ 54. The user can then click on the image to view the full image displayed via linking to the Image Host Site. *Id.* Alternatively, if the user clicks on the file name or the description of the image in the Slideshow (displayed in the lower left-hand corner), the user is taken directly to the Image Host Site. *Id.* at ¶ 55. If the original image contains a watermark, copyright, or other attribution, that marking is present on the image in both the Slideshow and the Bing Image Search results page. *Id.* at ¶ 56. The border of the Slideshow identifies the information as linked to the Bing Internet search engine and when the user hovers over the Bing logo with his cursor, the user is invited to "see more images" resulting from that search query. *Id* at ¶ 57. If the user clicks on the logo, he is directed to the Bing Image Search results page. *Id.* As in Collage, the image order is the same as in the Bing Image Search results page. Hosp Decl., Exh. 3 (photo comparison between Slideshow and Bing Image Search results).

C.    **FOR YEARS, THERE HAVE BEEN MANY OTHER WAYS OF ACCOMPLISHING WHAT THE WIDGET DOES**

For years, website developers have had many tools at their disposal to link search engine image query results to their websites.  *See* Declaration of Philip Greenspun ("Greenspun Decl.") at Section VI.  In fact, Google and Bing offer "application programming interfaces" which require some level of programming expertise, but achieve capabilities functionally identical to the Widget.  *Id.* at ¶¶ 81-91.  Other widgets, such as those by SnapWidget and Flickr employ similar tools that can be implemented by individuals who lack programming expertise to attain similar results.  *Id.* at ¶¶ 92-98.

D.    **MICROSOFT HAS A BUSINESS RELATIONSHIP WITH GETTY**

Microsoft and Getty have had a business relationship for many years.  Microsoft respects the intellectual property of third parties, and, where appropriate, pays for licenses to use third party intellectual property.  Indeed, Microsoft has paid substantial licensing fees to Getty, and continues to make such payments.  Notwithstanding this business relationship, Getty did not even contact Microsoft to say that it was concerned about the Widget before filing suit.

## ARGUMENT

A "preliminary injunction is an extraordinary and drastic remedy" that should not be granted as a routine matter.  *Munaf v. Geren*, 553 U.S. 674, 676 (2008); *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 80 (2d Cir. 1990).  A district court may enter a preliminary injunction only "upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  "A plaintiff seeking a preliminary injunction must establish that (i) he is likely to succeed on the merits; (ii) that he is likely to suffer irreparable harm in the absence of preliminary relief; (iii) that the balance of equities tips in his favor; and (iv) that an injunction is in the public interest."  *Id*. at 20.  None of those four

requirements may be presumed.  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *Salinger v. Colting*, 607 F.3d 68, 77 (2d Cir. 2010).  The Second Circuit has cautioned that "[c]ourts should be particularly cognizant of the difficulty of predicting the merits of a copyright claim at a preliminary injunction hearing."  *Id.* at 80.  In this case, each of these factors weighs heavily against the requested preliminary injunction.

## I.   GETTY IS NOT LIKELY TO SUCCEED BECAUSE IT HAS NOT IDENTIFIED ANY SPECIFIC COPYRIGHTED WORKS THAT HAVE BEEN INFRINGED

A properly pleaded copyright infringement claim must identify the copyrighted works and specifically allege that those works have actually been infringed by the claimed unlawful conduct.  *Palmer Kane LLC v. Scholastic Corp.*, No. 12 Civ. 3890, 2014 WL 1303135 at *4 (S.D.N.Y. Mar. 31, 2014).  Getty is not likely to succeed for the threshold reason that it has not identified any actual infringements of the claimed copyrighted works.

In *Palmer*, the Court granted a motion to dismiss finding that the complaint failed "to properly allege the infringing acts committed by [defendant]."  *Id.* at 4.  The court held "a plaintiff may not rest on bare-bones allegations that infringement occurred." *Id.* at 3 (citing *Sharp v. Patterson*, No. 03 Civ. 8772, 2004 WL 2480426, at *12 (S.D.N.Y. Nov. 3, 2004); *see also Marvullo v. Gruner & Jahr*, 105 F. Supp. 2d 225, 230 (S.D.N.Y. 2000) (copyright infringement claim must allege "by what acts" defendant infringed the copyright); W. Patry, Copyright § 19:3 (2013) (plaintiff must plead "the acts by which defendant violated plaintiff's rights").

In this case, Getty asserts that Microsoft commits copyright infringement when a third-party website developer uses the Widget to link to and display image search results containing copyrighted images either in Slideshow or Collage mode.  Getty further asserts that it owns the copyrights in the 50 Getty Images, *see* Cmplt. at Ex. A, which it has identified as residing on the

11

Bing Thumbnail Library—and thus are allegedly susceptible to display by website developers using the Widget. ***Getty has not alleged, however, that any of the 50 images in suit have actually been displayed by any third-party website developer using the accused Widget***.[5]  As a result, Getty has not identified any specific infringing act and its claim would therefore not survive a motion to dismiss, and Getty thus cannot show a likelihood of success on the merits. S*ee, e.g.*, *Klein v. City of New York*, No. 10 Civ. 9568, 2011 WL 5248169, at *11 (S.D.N.Y. Oct. 28, 2011) (allegations that cannot withstand a motion to dismiss *a fortiori* cannot establish likelihood of success on the merits or serious questions going to the merits); *Ascentive, LLC v. Opinion Corp.*, 842 F. Supp. 2d 450, 470 (E.D.N.Y. 2011) (same).

## II.   GETTY IS NOT LIKELY TO SUCCEED BECAUSE THE CREATION OF THE THUMBNAIL LIBRARY IS FAIR USE

Getty concedes that Bing Image Search—and the Thumbnail Library it creates—do not infringe its copyrights.  Mem. at 18 ("[T]his case is not about Bing Image Search or, for that matter, any other search engine, to the extent that it creates and displays low-resolution, thumbnail sized images that, when clicked, lead only to an image in the context of the source website.").  Nor could it make any argument to the contrary with a straight face.  Numerous

---

[5] Getty does not assert that Microsoft commits an infringement in the creation of the Thumbnail Library in connection with Bing Image Search's core search functionality, which is clearly a fair use under long-established law.  Mem. at 18.  Getty only alleges that an infringement occurs when Bing Image Search results are displayed by a website publisher on his website *using the Widget*.  However, Getty purposefully conflates its discussions of the long-established and lawful process whereby search engines such as Bing make small copies of third-party images for indexing and search purposes, *see generally Perfect 10 v. Amazon*, 508 F.3d 1146 (9th Cir. 2007), with the specific challenged conduct in this case, *i.e.*, the provision of a Widget that helps third-parties to place those lawful search results on their webpages.  A close reading of the Complaint and Memorandum of Law shows that Getty does not allege that the images that are lawfully in the image search index have ever been used with the challenged Widget.  In other words, Getty tries to bootstrap the lawful copying in connection with standard search indexing to the operation of the Widget in an effort to obscure its absence of evidence of use.

12

courts have considered the legality of the creation of thumbnail copies of third-party images by search engines to act as "pointers" to the source on the Internet and found that to be a fair use. *See, e.g.*, *Perfect 10*, 508 F.3d at 1168 (finding creation and display of thumbnail image copies in connection with search function is transformative fair use).[6]

Indeed, to the extent that Getty ever believed that the images contained in the Thumbnail Library constituted copyright infringement, it should have served a "takedown" notice under the Digital Millennium Copyright Act, 17 U.S.C. § 512(d)(3) ("DMCA").  There is no question that the Thumbnails generated by Bing Image Search are merely "pointers" to the source of the original on the Internet (whether used for traditional search or displayed as search results using the Widget), and that Microsoft meets all applicable requirements under Section 512(d). Nonetheless, searches of Microsoft's records have revealed not a single such notice filed by Getty with Microsoft within the past two years.[7]

Despite the law, and its concession that Bing Image Search itself does ***not*** infringe, Getty elsewhere asserts (with no explanation) that Microsoft "infringes Plaintiff's reproduction rights" when Microsoft's Bing Image Search crawls the web and makes a small thumbnail copy of every

---

[6] *See also Kelly v. Arriba Soft*, 336 F.3d 811, 815 (9th Cir. 2003) (same); *Associated Press v. Meltwater*, 931 F. Supp. 2d 537, 555 (S.D.N.Y. 2013) (noting that use of thumbnails image copies in search engine functionality is fair use, and distinguishing service that did not deal with image searches, and did not provide publicly available searches); *Fox News Network, LLC, v. TVEyes, Inc.*, 13 Civ. 5315, slip op. at 19 (S.D.N.Y. Sept. 9, 2014) (finding that use of thumbnails and video clips in connection with search function is transformative fair use); *Authors Guild, Inc. v. Google, Inc.,* 954 F. Supp. 2d 282, 291-92 (S.D.N.Y. 2013) (finding that use of text snippets similar to thumbnails in connection with search is transformative fair use). In each case, the creation and provision of image thumbnails has been upheld as a fair use.

[7] As a search engine, Bing qualifies under the safe harbor provisions of the DMCA, which limits damages and remedies available to rights holders for certain alleged infringements.  The DMCA provides the *only* remedy for Getty's alleged infringements.  Getty must, as proscribed in 17 U.S.C. Section 512(c)(2), submit a notice of alleged infringement, providing a specific location for an allegedly infringing image that Microsoft can remove from its index so that it will no longer appear in its search engine.

image.  Mem. at 10.  In this assertion, Getty conflates the Thumbnail Library images that already

exist (and the creation of which was a fair use), with the operation of the Widget that helps third-

parties access those Thumbnails.  The Thumbnails are created only in connection with Bing

Image Search's search; the Widget does not create new copies.

Moreover, the Bing Image Search results that appear through the use of the Widget serve

the same fair use search purpose when displayed on a website developer's third-party site.  As

the Webmaster Portal for the Widget indicates, the tool is offered to website developers to

"enhance[] your web site with the power of Bing Image Search."[8]  Hosp Decl., Exh. 4

(Webmaster Portal web page).  Of course, that is what it is used for—to provide image search

links to information related to the subject matter of the third party website.  Thus, for example, if

a website has content related to Abraham Lincoln, the website developer might choose to display

the results of a Bing Image Search for "Abraham Lincoln Civil War," which would display

images that could then be clicked on (or hovered over) to identify additional websites with

information on the topic—immediately and directly pointing anyone viewing the third-party

website to more content.[9]  This is, of course, exactly the purpose of Bing Image Search, and what

---

[8] Getty's claim that Microsoft does not promote the Widget as a search engine, Mem. at 7, is
clearly false.

[9] Getty's claim that "Defendant intentionally masks the third-party source website and any
context that surrounds the image as it appears on that third-party site," Mem. at 7, is also
inaccurate.  Hovering over the image reveals the source of the image, and clicking on the image
allows the user to access the link to the search results that lead to the source website.  *See* Vaidya
Decl. at ¶¶ 42-43, 54-55.  Indeed, the purpose of the Widget is to enable the website developer to
ensure that users his Web Developer's Website can quickly identify and link to sources that have
additional information about the queried topic.  Without the Widget, the website developer has to
manually code his site to ensure that not only the image he wants appears, but also that the
linking and source information appears as well.

has repeatedly been found to constitute a fair use as described above.[10]

### III.    GETTY IS NOT LIKELY TO SUCCEED BECAUSE THE WIDGET NEITHER COPIES NOR DISPLAYS ANY COPYRIGHTED WORKS

Getty argues that when a website developer uses the Widget, the Widget transmits and displays copies of images on the website developer's third party websites.  Mem. at 11 ("Defendant populates the display panel with Defendant's own thumbnail copies of the images from its own servers.")  This is simply factually incorrect.  In both Slideshow and Collage, the only thing that is ever provided to the Web Developer's Website is HTML computer code that points a portion of the Web Developer's Website to the Image Host Site so that the images contained there can be viewed through the Web Developer's Website.  In other words, the Widget merely provides a location address or pointer, not a copy of the image itself.  It is well-established that this type of HTML in-line address linking does not constitute copying or display of an image.  Indeed, this is precisely the issue that was considered in *Perfect 10*.  In that case, the Ninth Circuit concluded,

> Instead of communicating a copy of the image, Google provides HTML instructions that direct a user's browser to a website publisher's computer that stores the full-size photographic image. Providing these HTML instructions is not equivalent to showing a copy. First, the HTML instructions are lines of text, not a photographic image. Second, HTML instructions do not themselves cause infringing images to appear on the user's computer screen. The HTML merely gives the address of the image to the user's browser. The browser then interacts with the computer that stores the infringing image. It is this interaction that causes an infringing image to appear on the user's computer screen. Google may facilitate the user's access to infringing images. However, such assistance raises

---

[10] Getty rests its entire argument on its assertion that the Widget "does not function as 'a pointer directing a user to a source of information' but rather functions as a substitute for the exact same content that Plaintiff offers for licensing for the exact same use."  Mem. at 18.  Once again, in its haste to run to court, Getty simply gets its facts wrong.  Unlike the images offered by Getty's embed tool (which links back only to Getty's website), the Bing Image Search images utilized by the Widget is to provide links to additional websites with additional relevant information on a given topic.  They are exactly what Getty says they are not: pointers to additional sources.

only contributory liability issues, and does not constitute direct infringement of the copyright owner's display rights.

508 F.2d at 1161 (citations omitted).  As a result, because the Widget neither copies nor displays any images, there can be no direct infringement.

Getty dismisses these key technical facts as "an under-the-hood quirk of computer engineering," Mem. at 12, but whether a copy or display is actual made is critically important and case dispositive, as shown above.  And *American Broadcasting Cos. v. Aereo, Inc.*, 134 S.Ct. 2498 (2014), does not instruct otherwise.  In that case, which considered not copying or display, but "public performance," the Court considered a unique set of facts related to the regulation of early cable systems and the purpose behind certain revisions to the Copyright Act in 1976.  *See generally*, *id*. at 2504-07 ("Aereo's activities are substantially similar to those of the CATV companies that Congress amended the Act to reach.").  The decision turned on Aereo's "overwhelming likeness to the cable companies targeted by the 1976 amendments," *id*. at 2507, and the Court was wary of affecting existing copyright doctrines relied on by other industries. *Id*. at 2510 (describing decision as a "limited holding" not applicable to "other technologies, including new technologies, that Congress could not possibly have wanted to reach."); *see also id.* at 2511 (carving out "technologies not before us" and agreeing that issues related to other technologies "should await a case in which they are squarely presented.").

## IV.     GETTY IS NOT LIKELY TO SUCCEED ON DIRECT INFRINGEMENT BECAUSE MICROSOFT IS NOT THE VOLITIONAL ACTOR

Distinguishing between direct and indirect infringement is important in this case.  In many copyright disputes, the identity of the alleged infringer is not disputed.  Here, though, a key dispute is *who* "does" the alleged infringing conduct: the third-party Widget user or Microsoft. This is called the "volition" question.  *See Cartoon Network v. CSC Holdings, Inc.*, 536 F.3d 121

16

(2008) ("*Cablevision*"); Patry, § 9:5:50 ("A defendant may be held directly liable only if it has engaged in volitional conduct that violates the Act.").

In order to establish **direct** infringement, Getty must establish that it is Microsoft who actually engages in the conduct that causes an unauthorized copy or display to be made.  As shown below, however, it is well-established that a technology provider like Microsoft, which merely creates a system that others can use, cannot be liable for direct copyright infringement where its system merely functions automatically in response to user commands.  On this issue, the simple question of who "presses the button" to cause the alleged infringement to occur is a critically important legal question.  Here, there is no dispute that the Widget is implemented and used by third party web publishers, operates automatically, and that no alleged infringing actions ever occur unless initiated by the user.  This is true for both Slideshow and Collage.  As a result, Getty cannot succeed on its claim that Microsoft is a direct infringer.

In moving for a preliminary injunction, Getty relies exclusively on allegations of direct infringement.  Getty's Complaint also makes indirect infringement claims, *see* Cmplt. ¶ 35, but those claims are **not** asserted in Getty's moving papers as a basis for its request for a preliminary injunction.  *See* Mem. at 10, *et seq.*  (arguing direct infringement only).  As a result, the likelihood of success of any indirect infringement is not before the Court on the present motion.[11]

---

[11] Getty's strategic decision not to raise its indirect claims in the present motion reflects the obvious weakness of those claims.  For example, a claim of "contributory infringement" cannot succeed where the product or service is "capable of substantial non-infringing uses."  *See Mathew Bender & Co. v. West Publ'g Co.*, 158 F.3d 693, 706 (2d Cir. 1998) (citing *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 442 (1984)).  Here, there are countless photographs that are public domain, subject to Creative Commons licensing, or otherwise licensed for such use.

17

### A.    The User—Not Microsoft—Is The Volitional Actor

Volition is a long-established principle in copyright law.  In one of the earliest Internet cases, *Religious Technology Center v. Netcom On-Line Comm. Svcs., Inc.*, 907 F. Supp. 1361 (N.D. Cal. 1995) ("*Netcom*"), the Court found an Internet service provider not liable for direct infringement where it "did not take any affirmative action that directly resulted in copying plaintiffs' works" and its system was "merely used to create a copy by a third party."  *Id*. at 1368; 1370.  *Netcom* was subsequently followed by the Fourth Circuit in *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 550 (4th Cir. 2004) ("*CoStar*"), where the court explained that "a person had to engage in volitional conduct—specifically, the act constituting infringement—to become a direct infringer," and held that direct infringement requires more "than mere ownership of a machine used by others to make illegal copies."  *Id*. (emphasis added).

Relying on these seminal cases, the Second Circuit in *Cablevision* found that the defendant was not directly liable for making copies in its remote-storage DVR ("RS-DVR") system because it was the user who "made" the copies by pressing the "record" button.  536 F.3d at 131, 133.  The court of appeals recognized that "volitional conduct is an important element of direct liability," and explained that in the case of a system that responded automatically to consumer commands, it was the user, not the technology provider, who supplied the necessary volitional conduct.  *Id.* at 131.[12]  Most recently, in *Fox Broad. Co. v. Dish Network LLC*, 747 F.3d 1060, 1066-68 (9th Cir. 2014), the court found no volitional act by the technology provider because the "***user, not [defendant], [took] the initial step of enabling***" the challenged functionality.  *Id.* at 1067 (emphasis added) ("The user, then, and not [defendant], is 'the most

---

[12] Notably, the Supreme Court was careful to avoid overturning *Cablevision* in its recent Aereo decision.  *See, e.g.*, *Aereo III*, 134 S. Ct. at 2511.

significant and important cause' of the copy.").  The Ninth Circuit affirmed, holding that "operating a system used to make copies at the user's command does not mean that the system operator, rather than the user, caused copies to be made."  *Id*. at 1067.[13]

Given the volition rule, Microsoft cannot be liable for direct infringement because its Widget operates automatically and it is the user—the third-party website developer, not Microsoft—who initiates and engages in the acts that could give rise to any alleged direct infringement claim.  *See* Vaidya Decl. at ¶¶ 25; 27-33; 34-43.  Specifically, the website developer chooses to use the Widget, conducts a search for the desired images, makes selections concerning number and size of the images, copies the resulting code reflecting the search, and enables use of the Widget by pasting it into his or her website.  *Id*. at ¶¶ 27-33; 34-43.  The Widget does nothing unless instructed to do so by the website developer, who is already familiar with how to accomplish what the Widget makes simpler.  All the Widget does is save a website developer some programming time.  *Id*.

Although Getty generally tries to paint Microsoft as the actor, a close reading of the Complaint and Memorandum of Law reveals that Getty concedes—as it must—that it is actually the third-party website publisher who is the volitional actor.  *See* Mem. at 5 ("…the display can be customized by the website publisher before he or she copies and pastes the Bing Widget code into his or her own pages ("the code will change depending on the choices that the website publisher makes).");  *id*. ("if the publisher chooses the 'collage' format");  *id*. at 6 ("[i]f the website publisher chooses instead to have a 'slideshow'...");  Compl. at ¶ 2 (Microsoft "allows

---

[13]  Several additional courts have held that the automatic conduct of software is not "volitional" and cannot give rise to direct liability for the provider of the technology.  *See, e.g.*, *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 742-43 (S.D.N.Y. 2012); *Arista Records LLC v. Usenet.com*, Inc., 633 F. Supp. 2d 124, 147-48 (S.D.N.Y. 2009); *Disney Enters., Inc. v. Hotfile Corp.*, 798 F. Supp. 2d 1303, 1309 (S.D. Fla. 2011).

website publishers to embed a panel on their website").

**V.      THE COURT SHOULD DENY THE INJUNCTION BECAUSE GETTY HAS PROVIDED NO EVIDENCE OF HARM, LET ALONE IRREPARABLE HARM**

A plaintiff must also demonstrate irreparable harm, *Salinger,* 607 F.3d at 79 -80, which "is perhaps the single most important prerequisite for the issuance of a preliminary injunction." *Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*, 754 F. Supp. 2d 616, 621 (S.D.N.Y. 2010) (quoting *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002)).  The claimed harm must be "neither remote nor speculative, but actual and imminent" and plaintiff must show that it "cannot be remedied if a court waits until the end of trial to resolve the harm."  *Appalseed Productions, Inc. v. MediaNet Digital, Inc.*, No. 11 Civ. 5922, 2012 WL 2700383, at *8 (S.D.N.Y. July 6, 2012) (internal quotation marks omitted).

Here, there is simply no basis for a finding of irreparable harm because any alleged harm is purely speculative, and Microsoft has agreed for the pendency of this case to limit any future re-launch of the Widget to public domain or licensed images.  Where there is no risk of the complained of conduct, there can be no irreparable harm.  *See, e.g.*, *Stokely-Van Camp, Inc. v. Coca-Cola Company*, 646 F. Supp. 2d 510, 524-25 (S.D.N.Y. 2009) (finding no irreparable harm could exist where defendant declared it would not resume claimed infringing conduct during pendency of the litigation); *Pan American World Airways, Inc. v. Flight 001, Inc.*, No. 06 Civ. 14442, 2007 WL 2040588, *6 (S.D.N.Y. July 13, 2007) (same).  In addition, for the reasons set forth below, Getty has failed to show that it has been or will be irreparably harmed.

**A.      There Is No Present Harm Because There Is No Evidence (Or Allegation) That The Copyrighted Images Have Been, Or Will Be, Used With The Widget**

Getty identifies 50 copyrighted images in its Complaint, but it never alleges that these copyrighted images have, in fact, been copied or displayed by any website developer using the

Images Widget.  *See generally* Section I, *supra*.  Insofar as there is no evidence that the claimed copyrighted images have been used in connection with the Widget, there can be no present harm. As a result, Getty can only rely on claims of future harm, which, as shown below, are specious.

**B.      Even If A Website Developer Accessed The Copyrighted Images Using The Widget, Getty's Conclusory Assertions Do Not Demonstrate Harm**

Getty's assertions of harm are speculative and unsupported.  The Second Circuit has expressly cautioned that courts "must not adopt a 'categorical' or 'general' rule or presume that the plaintiff will suffer irreparable harm."  *Salinger,* 607 F.3d at 79-80.  Rather, "the court must actually consider the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits.…"  *Id.*

Getty asserts that the Widget "destroys Plaintiff's actual and potential relationships," directly competes with Plaintiff's products, and "threatens to undermine" "current [and] future market share." Mem. at 20.  But Getty offers no explanation why the Widget would "destroy[] Getty's actual and potential relationships."  *Id.*  Getty never identifies what "relationships" would be destroyed, how, or why it would matter.  Tellingly, Getty has submitted no evidence to show it has lost any clients or market share.  *Esbin & Alter, LLP v. Sabharwal, Globus, & Lim, LLP*, 403 Fed.Appx. 591, 593 (2d Cir. 2010) (finding record insufficient to show irreparable harm, where no evidence was submitted establishing the loss of market share or client).

Getty also claims that, "[i]f website publishers can … obtain from Defendant a virtually limitless collection of online images for display on their websites for free and without restriction, they will have little or no incentive to license such uses from Getty Images."  Mem. at 20.  This is pure speculation—and it is wrong.  As described more fully in the Greenspun Declaration, there are numerous longstanding and simple-to-use techniques and third-party code and applications that permit website publishers to place third-party images on their own websites,

21

often without ensuring that the source information regarding the image remains intact (although the Widget aims to make sure that the source information does remain intact and available to the end user).  As a result, without further evidence, there is no basis to conclude that Microsoft's provision of the Widget will affect the motivations any of third parties.

Getty also asserts that "the Bing Widget identifies Defendant's own brand with Getty's protected content," and Defendant thereby "misappropriates the customer good will that Plaintiff has created…."  Mem. at 20.  But there was nothing about the Widget that suggests that Bing—a famous *search* engine—is the author of any copyrighted works being shown.  To the contrary, in both Slideshow and Collage mode, the source of the image is shown to the user when he or she places the mouse over the image.  *See* Vaidya Decl. at ¶¶ 42; 45, 57.  In addition, no watermark, copyright marks, or any other mark on the image is removed.  Getty's assertion of misappropriation of goodwill is thus unsubstantiated and conclusory.  *See Uni-World Capital L.P v. Preferred Fragrance, Inc.*, No. 13 Civ. 7204, 2014 WL 3417281 at \*24 (S.D.N.Y. July 10, 2014) ("'conclusory statements of loss of reputation and goodwill constitute an insufficient basis for a finding of irreparable harm.'").[14]  In fact, one of the purposes of the Widget is to allow website developers to provide image search results that contain image identifying information so that users can navigate to find additional related information online.  Vaidya Decl. at ¶¶ 23; 25.

In addition, Getty baldly asserts that it will be immediately harmed, Mem. at 2, 9, 19, but it offers no facts to support a finding that the claimed harms described above will actually occur before this matter may proceed to trial.  *See Jayaraj v. Scappini*, 66 F.3d 36, 40 (2d Cir. 1995)

---

[14] Moreover, Getty's assertion sounds in trademark law, not copyright, and Getty has not asserted a claim under trademark law.  *See Perfect 10*, 508 F.3d at 1161.  Thus, Getty's citation to *N.Y. City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305 (S.D.N.Y. 2010), a trademark case, is inapposite.

(irreparable harm measured by what will occur prior to final disposition of the case on the

merits).  Without such facts, the can be no finding of irreparable harm.

### C.        There Is No Harm Where Defendant's Actions Have No Detectable Effect

The Widget does nothing more than existing image search engines and widgets already

do.  Website developers can already search for and copy images (including Getty images) from

the Internet.  *See* Greenspun Decl. at Section VI.  Such images can be found using Bing's image

search function or countless other image search tools, such as Google or specialized search

engines like Picsearch.com.  Once found, the images can be easily copied, either by going to the

website or as a Thumbnail, and put on a website directly or using an HTML pointer, either with

or without a license.  *See id*.  As a result, the record does not permit a finding of irreparable

harm.  *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 981-982 (9th Cir. 2011) (preliminary

injunction denied where plaintiff had not shown "sufficient causal connection between

irreparable harm to its business and the defendant's operation of its search engine," where other

search engines also contributed to making copyrighted images freely available).

### D.        Even If the Copyrighted Images Are Used With The Widget, And Such Use Causes Harm To Getty, The Harm Is Not Irreparable

Getty must also show that the "remedies available at law, such as monetary damages, are

inadequate to compensate for that injury."  *Salinger*, 607 F.3d at 79-80.  Getty claims that

"monetary damages caused by Defendant's conduct are impossible to calculate," pointing to "the

scale" of Defendant's conduct, is unfounded.  Mem. at 20-21.  But, Getty's images represent a

tiny fraction of the billions of images on the Internet, and Getty Images is in the business of

licensing images; it is not an artist or photographer with any interest in preventing publication of

the images or attempting to exclude others from displaying its images.  It is a business intimately

familiar with the business of licensing copyrights to images, which includes licensing its images

23

and calculating licensing revenues. Compl. at ¶ 11 (Getty is a "content provider" whose "revenue is generated primarily by licensing the rights to use its content.").[15]

Indeed, Getty Images frequently pursues copyright infringers in court and reaches agreements as to licensing and/or use of the works.  It has filed 14 such lawsuits since 2006.  As a result, to the extent that Getty identifies an actual infringement of one or more of the 50 or so identified works, monetary damages can be determined.  There is, however, no irreparable harm in the absence of a preliminary injunction, and therefore no basis to issue such an injunction.

## VI.    THE BALANCE OF HARDSHIPS DOES NOT TIP IN GETTY'S FAVOR

Because Getty cannot demonstrate any imminent irreparable harm, it cannot carry its burden of showing that the balance of harms tips decidedly in its favor.  *See Buffalo Forge Co. v. Ampco–Pittsburgh Corp.,* 638 F.2d 568, 569 (2d Cir. 1981) ("the movant must show that the harm which he would suffer from the denial of his motion is 'decidedly' greater than the harm his opponent would suffer if the motion was granted").  Microsoft has spent time and effort to develop the Widget in order to improve the user's ability to provide references to the original location of images on the Internet given that popular methods of inserting images often obscure source information.  But where neither party would be greatly harmed, the balance of hardships remains neutral.  *Apple, Inc. v. Samsung Elecs. Co., Ltd.,* 735 F.3d 1352, 1371 (Fed. Cir. 2013).

## VII.    AN INJUNCTION IS NOT IN THE PUBLIC INTEREST

Image search tools serve the important public interest of organizing otherwise

---

[15] "[B]ecause monetary injury can be estimated and compensated, the likelihood of such injury usually does not constitute irreparable harm."  *Broadcast Music, Inc. v. Pamdh Enters., Inc.*, No. 13-CV-2255, 2014 WL 2781846 at *4 (S.D.N.Y. June 19, 2014)).  This is especially true where, as here, Getty generally licenses its copyrights.  *Psihoyos v. John Wiley & Sons, Inc*., No. 11 Civ. 1416, 2011 WL 4634172 at *2 (S.D.N.Y. Oct. 4, 2011) (no irreparable harm where plaintiff had never refused to license before).

inaccessible information on the Internet and allowing users to find and access that information. *See Perfect 10*, 508 F.3d at 1166 (recognizing that image search "serves the interests of the public" and "provide great value to the public"). The Widget furthers that public interest by making image search more widely available and easier to use, and making it easier for a website publisher to include the source information regarding the images. As described in the Greenspun Declaration, alternative methods for using images on websites often obscure source information. The Widget includes that information, which is helpful to photographers, owners, and users.

The public also has an interest in complete Internet search results, and not results artificially limited by overreaching claims of works owners. Notwithstanding the fact that Getty's images represent a tiny fraction of the billions of images on the Internet, Getty seeks to shut down access to ***all*** images. The public has a right to access even the most valuable protected images for their own fair use purposes, whether it is criticism, comment, teaching or any other fair use. *See generally* 17 U.S.C. § 107.[16] If Microsoft cannot return complete image search results that include the source information and thus help enable the public to locate and comment on them, the public will be denied the ability to make those protected fair uses of certain copyrighted works.

## CONCLUSION

For these reasons, Getty's motion for a preliminary injunction should be denied.

---

[16] For example, consider a high school teacher preparing a website for her students discussing depictions of slavery in the 1800s (which would likely be either in the public domain or fair use). Rather than directing readers to a search engine (where they would need to perform their own queries) that teacher can select specific search queries and present students with search results to learn more about the specific image.

Dated: September 11, 2014

                                               _____*/s/ R. David Hosp*_____
FISH & RICHARDSON P.C.
R. David Hosp (DH 3344)
Elizabeth E. Brenckman (*pro hac vice forthcoming*)
601 Lexington Avenue, Floor 52
New York, NY 10022
Telephone: (212) 765-5070
Facsimile:  (212) 258-2291
Email: hosp@fr.com
            brenckman@fr.com

    -and-

Mark S. Puzella (*pro hac vice forthcoming*)
Sheryl K. Garko (*pro hac vice forthcoming*)
One Marina Park Drive
Boston, MA 02210
Telephone: (617) 542-5070
Facsimile:  (617) 542-8906
Email: puzella@fr.com
            garko@fr.com

26

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 11, 2014, I caused the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

_____*/s/ R. David Hosp*_____
R. David Hosp