UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GETTY IMAGES (US), INC.,

                        Plaintiff,

        v.                                          NO. 14-CV-7114-DLC

MICROSOFT CORPORATION,                              **ORAL ARGUMENT REQUESTED**

                        Defendant.


**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION**
**<u>FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION .................................................................................................................1

FACTUAL BACKGROUND ...................................................................................................3

I.      Getty Images And Its "Embed" Feature. ..................................................................3

II.     Microsoft And The Bing Image Widget. ..................................................................4

SUMMARY JUDGMENT STANDARD ...................................................................................9

ARGUMENT .......................................................................................................................9

I.      Defendant Directly Infringed Plaintiff's Exclusive Rights Under The Copyright Act........................................................................................................................9

        A.     Plaintiff Owns Valid Copyrights In Images That Defendant Selected For Display In The Bing Image Widget.......................................................................9

        B.     Defendant Directly Infringed Plaintiff's Exclusive Rights Under The Copyright Act....................................................................................................10

               1.    Defendant's Infringement Of Plaintiff's Reproduction Right ...................10

               2.    Defendant's Infringement Of Plaintiff's Display Right............................11

               3.    Defendant's Infringement Of Plaintiff's Distribution Right.....................17

        C.     Defendant's Attempt To Avoid Direct Liability Based On A Supposed Lack Of "Volition" Is A Red Herring.................................................................17

II.     Defendant's Infringement Cannot Be Excused As Fair Use. ...........................................20

III.    Defendant's Affirmative Defense Of "Unclean Hands" Fails As A Matter Of Law.........26

CONCLUSION....................................................................................................................29

CASES

*American Broadcasting Cos. v. Aereo, Inc.*, 134 S. Ct. 2498 (2014) .....................................13, 18

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...................................................................9

*Arista Records, LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010) ..........................................................9

*Arista Records LLC v. Lime Group LLC*, No. 06-CV-5936(KMW), slip op. (S.D.N.Y. Aug. 9, 2010), Dkt. #302 ................................................................................................................2

*Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124 (S.D.N.Y. 2009).........................10

*Associated Press v. Meltwater United States Holdings, Inc.*, 931 F. Supp. 2d 537 (S.D.N.Y. 2013).........................................................................20, 21, 23, 25, 26, 29

*Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014) ...................................................21

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) .....................................................21, 22

*Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640 (S.D.N.Y. 2013) ..........................2, 17

*Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 618 (2013) ...................22

*Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc.*, 150 F.3d 132 (2d Cir. 1998) ......................................................................................................................................23

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ..............................................................................9

*Columbia Pictures Industries Inc. v. Fung*, No. 2:06-cv-5578SVW-JC, slip op. (C.D. Cal. Aug. 7, 2013), Dkt. #554 .......................................................................................................2

*Consumers Union of United States, Inc. v. General Signal Corp.*, 724 F.2d 1044 (2d Cir. 1983) ......................................................................................................................................22

*Davis v. Blige*, 505 F.3d 90 (2d Cir. 2007) ...................................................................................16

*De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate Inc.*, No. 04 Civ. 4099, 2005 WL 1164073 (S.D.N.Y. May 18, 2005) ........................................................................28

*Fox News Network, LLC v. TVEyes, Inc.*, 13 Civ. 5315, __ F. Supp. 3d __, 2014 WL 4444043 (S.D.N.Y. Sept. 9, 2014).......................................................................... 21-22, 26

*Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539 (1985) .............................21

*Infinity Broadcast Corp. v. Kirkwood*, 150 F.3d 104 (2d Cir. 1998)...............................20, 21, 22

*Jackson v. Odenat*, 9 F. Supp. 3d 342 (S.D.N.Y. 2014) ............................................................27

*Jian Zhang v. Baidu.com Inc.*, 10 f. Supp. 3d 433 (S.D.N.Y. 2014) ..........................................19

*Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003) .........................................................11

*Lennon v. Premise Media Corp.*, 556 F. Supp. 2d 310 (S.D.N.Y. 2008) ....................................20

*Malibu Media, LLC v. Lee*, No. 12-cv-03900, 2013 WL 2252650 (D.N.J. May 23, 2013) ....27, 28

*MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 842 F. Supp. 2d 682 (S.D.N.Y. 2012) ..........27

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) .........................12, 14, 18, 24

*Perfect 10, Inc. v. CCBill, LLC*, 488 F.3d 1102 (9th Cir. 2007)..................................................29

*Perfect 10, Inc. v. Giganews, Inc.*, No. CV11-07098, 2013 WL 2109963 (C.D. Cal. Mar. 8, 2013) ...............................................................................................................................18

*Perfect 10, Inc. v. Google, Inc.*, 416 F. Supp. 2d 828 (C.D. Cal. 2006), *aff'd in relevant part sub nom.*, *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) ........................................................................................................................11, 14, 16

*Rogers v. Koons*, 960 F.2d 301 (2d Cir. 1992) ..........................................................................10

*Scotto v. Almenas*, 143 F.3d 105 (2d Cir. 1998) .........................................................................9

*Search King, Inc. v. Google Technology, Inc.*, No. CIV-02-1457-M, 2003 WL 21464568 (W.D. Okla. May 27, 2003) ...........................................................................................19

*Society of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29 (1st Cir. 2012), *cert. denied*, 133 S. Ct. 1315 (2013) ................................................................................18

*Southwestern Bell Media, Inc. v. Trans Western Publishing Inc.*, 670 F. Supp. 899 (D. Kan. 1987)...................................................................................................................28

*Specialty Minerals, Inc. v. Pluess-Staufer AG*, 395 F. Supp. 2d 109 (S.D.N.Y. 2005)...........27, 28

*Warner Bros., Inc. v. Gay Toys, Inc.*, 724 F.2d 327 (2d Cir. 1983).........................................27, 28

*Wright v. Warner Books, Inc.*, 953 F.2d 731 (2d Cir. 1991)........................................................20

STATUTES

17 U.S.C. § 101 .................................................................................................................10, 11, 13

17 U.S.C. § 106..........................................................................................................................2

17 U.S.C. § 106(1) ......................................................................................................................10

17 U.S.C. § 106(3) ........................................................................................10, 17

17 U.S.C. § 106(5) ...............................................................................................10

17 U.S.C. § 107 ....................................................................................................20

17 U.S.C. § 201(b) ...............................................................................................10

17 U.S.C. § 512(d) ...............................................................................................29

17 U.S.C. § 512(n) ...............................................................................................29

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 94-1476 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659 ................................11, 13

**OTHER AUTHORITIES**

79 Fed. Reg. 41,309 (July 15, 2014) .........................................................18

Fed. R. Civ. P. 56(a) ...........................................................................................9

II Paul Goldstein, *Goldstein on Copyright* § 7.0.2 (3d ed. 2014-1 Supp.) ....................18

2 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 8.20[A] (2014) ....................16

4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.08[C] (2014)....................18

4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.09[B] (2014)....................27

## INTRODUCTION

On August 21, 2014, Defendant Microsoft Corporation released a new service, called the "Bing Image Widget," that threatens to eviscerate the commercial market for the online licensing of digital images. Before its temporary cessation (in response to this lawsuit), the service provided website publishers with a virtually limitless supply of images that Defendant selected for display on the publishers' websites based on search queries of the publishers' choosing, all without regard for, or payment to, the owners of copyright in those images – including copyrights owned or controlled by Plaintiff.

Defendant marketed the Bing Image Widget to website publishers as a tool to enhance the visual appeal of their websites, telling publishers that the resulting display of images "enhances your website … and provides your users with beautiful, configurable image galleries and slideshows." Statement of Undisputed Facts ("SUF") ¶ 13. Rather than draw on a licensed collection of images for this purpose, however, Defendant instead supplied images from the Internet at large, using the collection of images that Defendant copied and indexed in connection with its Bing Image Search engine. Defendant's supply of images for the Bing Image Widget was therefore in the billions – essentially, every image that Defendant could find on the Internet – including Plaintiff's highly valuable copyrighted works. In effect, Defendant turned the entirety of the world's online images into little more than a vast, unlicensed "clip art" collection for the benefit of those website publishers who implemented the Bing Image Widget, all without seeking permission from the owners of copyrights in those images. Although the Bing Image Widget was online for less than a month before Defendant disabled it, Defendant by that time had already selected and displayed on websites around the globe many of Plaintiff's copyrighted images, without Plaintiff's permission to do so.

The question of Defendant's direct liability for copyright infringement is ripe for decision now, even as questions regarding the extent of Plaintiff's damages may await further discovery. As explained below, the undisputed facts demonstrate that Defendant reproduced, displayed, and distributed some number of Plaintiff's copyrighted images through the Bing Image Widget, in violation of Getty Images' exclusive rights under the Copyright Act, 17 U.S.C. § 106.[1]  The undisputed facts also confirm that Defendant's infringing use of those images cannot be excused as "fair use" of the sort that some courts have recognized for search engines that help users find sources of content on the Internet.  The Bing Image Widget was not such a search engine, but rather was (and was promoted as) a tool to supply content to websites in competition with Plaintiff's owned licensed offerings.  Plaintiff therefore requests that the Court grant summary judgment in Plaintiff's favor on the question of Defendant's liability for copyright infringement.

---

[1] Although Defendant has signaled an intention to contest Plaintiff's ownership of some of the works in suit, adjudication of Defendant's liability based on those works as to which Plaintiff's ownership is not genuinely in dispute is appropriate now.  As this Court has already recognized in denying Defendant's motion to dismiss, all of the works in suit were infringed in the same manner, so issues of ownership beyond those works as to which there is no genuine dispute do not affect the merits of liability.  *See* Opinion and Order at 8 (Nov. 24, 2014), Dkt. #68 (allowing Plaintiff to proceed on more than just those works identified in the complaint because "any claim for an image will be virtually identical to the claims already brought.").  Moreover, granting partial summary judgment on liability based on only a subset of works in suit is a common and well-established practice in online copyright infringement cases in this district and elsewhere. *See, e.g., Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640, 648 (S.D.N.Y. 2013) (granting partial summary judgment of defendant's copyright infringement liability based on "a number" of works on defendant's website as to which ownership was undisputed); *Arista Records LLC v. Lime Grp. LLC*, No. 06-CV-5936(KMW), slip op. at 3 (S.D.N.Y. Aug. 9, 2010), Dkt. #302 (noting the Court's adjudication of the defendant's liability based on a subset of copyrighted works before proceeding to additional discovery on damages and explaining that this approach "considerably simplified discovery leading up to the parties' motions for summary judgment"); *Columbia Pictures Indus. Inc. v. Fung*, No. 2:06-cv-5578SVW-JC, slip op. at 4 (C.D. Cal. Aug. 7, 2013), Dkt. #554 (reflecting bifurcation of case and ruling on liability based on only "the original 44 [works] listed in the Complaint" and proceeding to proof of damages and ownership of more works following partial summary judgment on defendant's liability).

# FACTUAL BACKGROUND

## I.     Getty Images And Its "Embed" Feature.

Plaintiff Getty Images (US), Inc. ("Getty Images") is one of the world's largest providers of visual content and the leading provider of images online.  SUF ¶ 1.  It supplies imagery, video, and music to businesses and consumers for a wide variety of uses, including websites, books, newspapers, magazines, film and television production, advertisements, and product packaging.  SUF ¶ 1.  Getty Images' collection of works includes many of the most iconic, creative and engaging photographic images ever created.  SUF ¶ 1.

To support these endeavors, Getty Images generates revenue primarily by licensing the rights to use its content.  SUF ¶ 2.  Getty Images originates and owns copyrights in much of the content it licenses, but also acts as a distributor for more than 150,000 other content suppliers, including photographers, illustrators, filmmakers, media organizations, and other stock photo companies.  SUF ¶ 2.  Getty Images owns or represents more than 80 million unique works of digital imagery and was the first company to license imagery via the Internet, currently delivering virtually all of its content through online means.  SUF ¶¶ 2, 3.  It maintains websites at www.gettyimages.com and istock.com, where visitors can search and view millions of images, and obtain licenses to use them.  SUF ¶ 3.

In March 2014, Getty Images revolutionized the way images are licensed and distributed online.  SUF ¶ 4.  Through Getty Images' innovative "Embed" feature, noncommercial websites and users of social media may now use – for free – approximately 50 million of Getty Images' copyrighted images, provided that the image is displayed using Getty Images' Embed tool.  SUF ¶ 4.  The Embed tool allows such users to embed a specific image into their website or social media post by copying and pasting a short snippet of HyperText Markup Language ("HTML")

code into the website or post.[2]  SUF ¶ 4.  When another user visits the website or social media post, the HTML code instructs the visitor's browser to obtain the specified image from Getty Images' servers.  SUF ¶ 4.  The embedded image is displayed in an embedded viewer that includes Getty Images' logo and the name of the photographer or content supplier.  SUF ¶ 4.  A viewer who clicks on the image is led to a webpage where he or she may license commercial uses of the image on a paid basis.  SUF ¶ 4.  Getty Images has the right to provide its Embed offering by virtue of its copyright ownership and contractual relationships with photographers and content suppliers.  SUF ¶ 2.

## II.  Microsoft And The Bing Image Widget.

Defendant Microsoft Corporation develops, licenses and sells a wide variety of products and services.  SUF ¶ 5.  One of Defendant's services is an Internet search engine known as "Bing," which includes a specialized, image-oriented search feature called "Bing Image Search."  SUF ¶ 6.  Like other search engines, Bing crawls the Internet for online content and creates an index of that content in a database stored on Microsoft's own servers.  SUF ¶ 7.  Bing responds to user search queries by consulting its index and providing to the user the content that Bing determines is most relevant to the query.  SUF ¶ 8.

When crawling the Internet for online content, Bing makes at least one copy of each image that it finds online and retains at least a reduced-size, "thumbnail" copy of each image on its servers.  SUF ¶ 9.  Bing Image Search displays the thumbnail copies to users in response to image search queries, along with larger-sized images and links to the third-party source websites that host the full-sized images from which Bing's copies were derived.  SUF ¶¶ 10-11.

---

[2] As this Court is aware, "HTML is computer code used to tell an Internet browser how to display content on a website."  Opinion and Order at 4 (Oct. 16, 2014), Dkt. #63.

On August 21, 2014, Defendant released the "Bing Image Widget," which it made available to the public from its website, www.bing.com/widget/image. SUF ¶ 12. Defendant marketed the Bing Image Widget to website publishers as a tool that "enhances your website with the power of Bing Image Search and provides your users with beautiful, configurable image galleries and slideshows." SUF ¶¶ 13, 14. Similar to Getty Images' "Embed" tool, the Bing Image Widget consisted of HTML code that website publishers could copy and paste into pages on their own websites. SUF ¶ 16. When that code was pasted into a website, a visitor to the site would be presented with an embedded display panel bearing the Bing logo. SUF ¶ 17. Within the embedded panel would be displayed images that Defendant selected as being most relevant to a search query specified by the website publisher. SUF ¶ 18.

Defendant provided website publishers with the ability to customize certain features of the Bing Image Widget before copying and pasting the Widget code into their own web pages (the code would change depending on the choices that the website publisher made). SUF ¶¶ 19, 27. For example, Defendant gave website publishers the option to have the images presented in a "collage" format or a "slideshow" format. SUF ¶ 20. If a website publisher selected the "collage" format, then the Widget's display panel would show a number of different thumbnail-sized images that Defendant selected based on the website publisher's search query. SUF ¶ 21. Thus, a query consisting of the words "Marilyn Monroe" yielded a "collage" display of the following collection of thumbnail images of the late actress:



SUF ¶ 22.

If the website publisher instead selected "slideshow," then the Widget's display panel would scroll through larger-sized versions of the images that Defendant determined to be relevant, one at a time, swapping out images every few seconds. SUF ¶ 23. Defendant allowed the website publisher to select the number of images that would appear in the slideshow, including as few as one image, in which case the Widget would display a single, static image of Defendant's choosing based on the website publisher's search query. SUF ¶ 24. For example, a query for "Marilyn Monroe" in "slideshow" mode would display the following large-sized image of Marilyn Monroe – an image that, in this example, is part of Plaintiff's collection:



SUF ¶ 25.  Once the website publisher made his or her selections and pasted the Widget code into the website, visitors to the website would see the images that Defendant selected for display in the Bing Image Widget display panel, without any further input from the website publisher. SUF ¶¶ 27-28.

Images that Defendant used to populate the Bing Image Widget display panel were not from some collection for which Defendant or users of the Widget had obtained licenses to use in this manner.  Instead, Defendant drew from the vast repository of billions of images that it copied and indexed from the Internet at large in creating the Bing Image Search library and index, including Plaintiff's copyrighted images, even though Defendant had no license or permission from Plaintiff to do so.  SUF ¶¶ 7, 9, 18, 53-56.

When the Bing Image Widget was in "collage" view, Defendant populated the display panel with thumbnail-sized copies of images that Defendant stored on its own servers.  SUF ¶ 35.  When the Bing Image Widget was in "slideshow" view, Defendant's HTML code instructed the website visitor's browser (in a manner that was invisible to the visitor) to obtain the larger-sized images from the third-party websites that hosted the images (in a manner that was invisible to those websites) and from which Defendant, when crawling the Internet, made its thumbnail copies.  SUF ¶¶ 32, 36-37.[3]  Although the larger-sized images that appeared in

---

[3] As a technical matter, Defendant's HTML code first instructed the visitor's browser to download and process a Javascript file from Defendant's servers.  SUF ¶ 29.  Defendant would provide that Javascript file, which contained further code instructing the visitor's browser to, among other things, download still more HTML files from Defendant's servers that rendered the Bing Image Widget display panel and populated the display panel with the images that Defendant selected as relevant to the website publisher's query, either from Defendant's own servers (in "collage" mode) or from a third-party host site (in "slideshow" mode).  SUF ¶¶ 30, 35-36.  The code also instructed the visitor's browser to download a copy of each image that Defendant selected for display in the Widget in order to render the image on the visitor's computer screen.  SUF ¶ 31.  The entire process was virtually instantaneous and invisible to users.  SUF ¶ 32.

"slideshow" view were hosted on third-party servers, Defendant masked the third-party source website and any context that surrounded the images on the third-party sites, creating the appearance that the images were instead coming from the Bing-branded display panel on the website that had implemented the Bing Image Widget.  SUF ¶¶ 32, 37, 39.  Further masking the images' origins, if the website visitor clicked on one of the images displayed in the Widget's display panel, Defendant's code would direct the visitor's browser not to the third-party source website, but instead to Defendant's own Bing Image Search website.  SUF ¶ 38.

Although Defendant drew on images and data that it collected through the operation of the Bing search engine, the Bing Image Widget did not function – nor did Defendant promote it – as a search engine that directed users to third-party sources of information online.  SUF ¶¶ 13-14, 40-41.  To the contrary, Defendant expressly marketed the Bing Image Widget as a website enhancement tool, designed to make websites on which the Widget was installed more visually attractive to users and to keep users from leaving the website, thereby increasing the website's economic value.  SUF ¶¶ 13-14.

On September 4, 2014, Plaintiff filed this action alleging that Defendant infringed its copyrights by reproducing, distributing and displaying Plaintiff's copyrighted works in the Bing Image Widget without authorization.  Defendant took down the Widget code from its website the next day, although it continued to support existing implementations of the Widget on third-party websites, despite having been informed by Plaintiff on September 5 – and again on September 10th – that those implementations of the Widget were still live and supported.  SUF ¶¶ 47-50.  On September 16, Defendant disabled the Widget so that it would not operate even for website developers who were still using code generated by the Widget prior to September 5.  SUF ¶ 51.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "The nonmoving party may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998), but rather "must produce specific facts indicating that a genuine factual issue exists." *Id.* (internal quotation marks omitted). "If the [nonmoving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (internal citations omitted).

## ARGUMENT

**I.    Defendant Directly Infringed Plaintiff's Exclusive Rights Under The Copyright Act.**

To establish copyright infringement, a plaintiff must show: (1) ownership of a valid copyright and (2) violation of one of the exclusive rights granted by 17 U.S.C. § 106. *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 117 (2d Cir. 2010). There is no genuine dispute that both elements are satisfied here.

**A.    Plaintiff Owns Valid Copyrights In Images That Defendant Selected For Display In The Bing Image Widget.**

In support of the First Amended Complaint ("FAC"), Plaintiff identified a non-exhaustive, representative set of sixty-two copyrighted works that Defendant infringed through the Bing Image Widget. *See* FAC ¶ 34 & Ex. A. Although Defendant argues that Plaintiff's ownership of copyrights in some subset of those sixty-two works is unresolved because the copyright registration certificates for that subset do not identify Plaintiff as the "copyright claimant," it is undisputed that Plaintiff is the registered copyright claimant for at least ten of the

works in suit (the "Undisputed Works"). SUF ¶ 52. There is thus no genuine issue of fact as to Plaintiff's ownership of valid copyrights in at least the ten Undisputed Works. *See, e.g., Rogers v. Koons*, 960 F.2d 301, 306 (2d Cir. 1992) ("The Copyright Act makes a certificate of registration from the U.S. Register of Copyrights *prima facie* evidence of the valid ownership of a copyright . . . ." (citing 17 U.S.C. § 410(c))); *see also id.* ("Protection under the copyright statute extends to pictorial works." (citing 17 U.S.C. § 102(a)(5))).[4]

**B.** **Defendant Directly Infringed Plaintiff's Exclusive Rights Under The Copyright Act.**

Among the exclusive rights in Section 106 of the Copyright Act are the rights to reproduce, publicly display and distribute copyrighted works. 17 U.S.C. § 106(1), (3), (5). Although the infringement of any of these independent rights would be sufficient to establish Defendant's liability here, Defendant infringed all three.

**1.** **Defendant's Infringement Of Plaintiff's Reproduction Right**

As previously explained, it is undisputed that Defendant crawled the Internet to find the images that it displayed through the Bing Image Widget and, in the process of such crawling, copied to its servers at least a "thumbnail" version of every image that it found online, including the Undisputed Works. SUF ¶¶ 9, 35-36. This unauthorized copying plainly infringed Plaintiff's reproduction right under Section 106 of the Copyright Act. *See Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 149 (S.D.N.Y. 2009) (reproduction right infringed where defendants "download[ed] copies of Plaintiffs' works" and "creat[ed] copies of the works on

---

[4] Although the registration certificates are *prima facie* proof of Plaintiff's ownership of the Undisputed Works, it is also worth noting that each of the Undisputed Works was created by a Getty Images staff photographer within the scope of each photographer's employment by Plaintiff. SUF ¶ 52. *See* 17 U.S.C. § 201(b) ("In the case of a work made for hire, the employer . . . owns all of the rights comprised in the copyright."); *id.* § 101 (defining "work made for hire" as, among other things, "a work prepared by an employee within the scope of his or her employment").

their computers without Plaintiffs' authorization"). Indeed, when technology companies have been sued for similar conduct in the past, they have not even bothered to contest this obvious point, arguing instead that their unauthorized copying was fair use – a defense that, as described below, is unavailable to Defendant here. *See Perfect 10, Inc. v. Google, Inc.*, 416 F. Supp. 2d 828, 838 (C.D. Cal. 2006) ("Google concedes that it creates and displays thumbnails" of the plaintiff's images), *aff'd in relevant part sub nom.*, *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 817 (9th Cir. 2003) ("As to the thumbnails, [the search engine company] conceded that [plaintiff] established a prima facie case of infringement of [plaintiff's] reproduction rights").

### 2. Defendant's Infringement Of Plaintiff's Display Right

The exclusive right to display a copyrighted work is violated when anyone, without permission of the copyright owner, "show[s] a copy" of the work to the public "either directly *or* by means of . . . *any* . . . device or process." 17 U.S.C. § 101 (definition of "display"; emphasis added). Congress purposefully defined the right broadly to "cover not only the initial rendition or showing, but also any further act by which that rendition or showing is transmitted or communicated to the public." H.R. Rep. No. 94-1476, at 63 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5676. It is beyond genuine dispute that Defendant has violated Plaintiff's display right here.

When the Bing Image Widget was set to "collage" view, Defendant populated the display panel with its own thumbnail copies of images from its own servers, including at least some of the Undisputed Works. SUF ¶¶ 35, 53.[5] Clearly, this means that Defendant was "displaying" those images for purposes of the Copyright Act, as courts have readily found:

---

[5] Attached as Exhibit A to the SUF, for the Court's convenience, is a chart specifying where in the record proof of the infringement of each of the Undisputed Works can be found.

> [B]ased on the plain language of the statute, a person displays a photographic image by using a computer to fill a computer screen with a copy of the photographic image fixed in the computer's memory. There is no dispute that Google's computers store thumbnail versions of Perfect 10's copyrighted images and communicate copies of those thumbnails to Google's users. Therefore, Perfect 10 has made a prima facie case that Google's communication of its stored thumbnail images directly infringes Perfect 10's display right.

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1160 (9th Cir. 2007) (footnote omitted). Although there are important differences between Defendant's service and that of Google in the *Perfect 10* case – differences that only underscore Defendant's liability here, as discussed below – in both cases the defendants' "computers store thumbnail versions of … copyrighted images and communicate copies of those thumbnails to [their] users." *Id.* Defendant's violation of the display right in this context, therefore, is abundantly clear.

When the Bing Image Widget was set to "slideshow" view, Defendant did not populate the display panel with images that reside on its own servers, but instead directed the user's browser (invisibly to the user) to download and display the larger-sized images from third-party websites that host them – again, including some of the Undisputed Works. SUF ¶ 36. While this technical difference from the "collage" view was immaterial to the user's experience – in both cases, the user was unaware of the source of the image and saw the image only as being displayed through a Bing-branded window, SUF ¶¶ 32, 37 – Defendant contends that this under-the-hood implementation detail means that the third-party source website, rather than Defendant, displayed the images when the Bing Image Widget was in "slideshow" view (Defendant, of course, has no such argument as to the "collage" view).

This sort of argument-from-engineering-loophole, however, is irreconcilable with the plain language of the Copyright Act, which broadly proscribes the display of works to the public "*either* directly *or* by means of . . . *any* . . . device or process." 17 U.S.C. § 101 (emphasis added). The legislative history of the statute confirms Congress's intention to cover even indirect displays of copyrighted works that are caused by means of any device or process. *See* H.R. Rep. 94-1476, at 64, *reprinted in* 1976 U.S.C.C.A.N. at 5697 ("In addition to the direct showings of a copy of a work, 'display' would include the projection of an image on a screen or other surface by any method . . . .").

Defendant's position is also inconsistent with the Supreme Court's recent decision in *American Broadcasting Cos. v. Aereo, Inc.*, 134 S. Ct. 2498 (2014). In *Aereo*, an Internet-based retransmitter of over-the-air television signals argued that it did not "perform the copyrighted work publicly" because each transmission technically came from a miniature antenna assigned to each user and, therefore, was a "private" rather than "public" performance. *Id.* at 2504, 2507-08. The Court rejected that argument, noting that the technical difference "means nothing to the subscriber. It means nothing to the broadcaster. We do not see how this single difference, invisible to subscriber and broadcaster alike, could transform a system" from infringing to non-infringing. *Id.* at 2507.

Here, like the technical distinctions asserted in *Aereo*, the technical differences between the storage locations of the images in the "collage" and "slideshow" views are irrelevant (and invisible) to both users and content owners, and it was only by Defendant's design and direction that images in "slideshow" view were retrieved from a third-party source rather than from Defendant's own servers. In both the "collage" and

"slideshow" views, the user experienced only a display via the Bing Image Widget, and in both instances the image was displayed without the consent of the copyright owner. As the *Aereo* decision teaches, and as the Copyright Act directs, it is this practical, functional perspective rather than technical gimmickry that should govern whether a particular mode of content delivery is infringing or not.

Nevertheless, Defendant argues for a different approach – namely, the so-called "server test" adopted by the Ninth Circuit in *Perfect 10*. There, the Ninth Circuit held that Google Image Search pages that merely directed the display of infringing images stored on third-party sites did not satisfy this test "[b]ecause Google's computers do not store the photographic images." 508 F.3d at 1160. *Perfect 10*, however, arose on fundamentally different facts, is not binding law in this Circuit and, in any event, was decided several years before the Supreme Court's decision in the *Aereo* case, which rejected the very sort of technical distinctions that underpinned the "server test."

The technology at issue in *Perfect 10* was that of a search engine functioning as such, which clearly influenced the court's adoption of the "server test." *See Perfect 10*, 416 F. Supp. 2d at 844 ("Merely to index the web so that users can more readily find the information they seek should not constitute direct infringement . . . ."). Here, as explained, the Bing Image Widget was neither functioning nor promoted as a search engine that directs users to other locations on the Internet. To the contrary, Defendant marketed the Widget exclusively to website publishers as a source of content that would attract users to their websites and, when a user clicked on a given image, cause the user to enter Defendant's own universe of websites. SUF ¶¶ 13-14, 38. In other words, the Bing Image Widget operated as a direct substitute for the licensed uses of Plaintiff's content.

The circumstances in which the *Perfect 10* court created its "server test," therefore, simply are not present here.

Indeed, Defendant's attempt to rely on the "server test" (adopted in a different context and in another Circuit) to evade liability serves only to show how ill-suited that test is to the facts of this case. According to Defendant, "the only thing that is ever provided to the Web Developer's Website is HTML computer code that points a portion of the Web Developer's Website to the Image Host Site so that the images contained there can be viewed through the Web Developer's Website." Def. Opp. to Prelim. Inj. at 15-16, Dkt. #11. Yet, it is Defendant who supplies that code from its own servers and directs and controls the entire process by which images are selected, extracted and viewed. Defendant's characterization is especially disingenuous as to the "collage" view, as the "Image Host Site" to which Defendant's code "points" is *Defendant's own server*, containing images that Defendant itself copied from the Internet at large, which Defendant's own Widget called up for viewing through a Bing-branded display panel. SUF ¶ 9, 17, 35.

And even in "slideshow" view, the entire process – from the creation and supply of the code, to the selection of images to display in the Widget in response to a query, to the direction of the end-user's browser to retrieve and display the image through the Bing-branded window – is by Defendant's design and under Defendant's exclusive control, invisible to both the website and the end user. SUF ¶¶ 27-33. To suggest that Defendant is not directly responsible for the display of images to the end user in these circumstances is to ignore entirely the practical reality

of the user experience, Defendant's exclusive role in the process, and the language of the Copyright Act.[6]

Even the *Perfect 10* court acknowledged that its "server test" was a policy judgment based on the facts before it, and did not characterize it as necessarily appropriate for every case. In adopting the test in that case, the court expressly acknowledged that application of the test in other settings was "susceptible to extreme or dubious results." *Perfect 10, Inc.*, 416 F. Supp. 2d at 839, *aff'd in relevant part sub nom.*, *Perfect 10, Inc.*, 508 F.3d 1146 (9th Cir. 2007). Whatever sense the server test may have made on the facts of *Perfect 10*, its application here would yield just such "extreme or dubious results" and would be inconsistent with copyright law's overarching goal "to secure a fair return for an author's creative labor and thereby to stimulate artistic creativity for the general public good." *Davis v. Blige*, 505 F.3d 90, 105 (2d Cir. 2007) (quotation marks omitted). Accordingly, Defendant's conduct, through the Bing Image Widget, is properly regarded as an infringing public display of Plaintiff's copyrighted images.

---

[6] At bottom, Defendant's position is that a person can violate the display right only if he or she first copies the work to his or her own server, thereby violating the reproduction right. This view collapses the display and reproduction rights, rendering the display right effectively meaningless. *See* 2 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 8.20[A], at 8-636 to 37 (2014) (observing that one of the "important function[s] of the display right" is its application to the electronic transmission of works that "does not implicate the reproduction right"). Moreover, Defendant's position would render meaningless all but the initial upload of an image to a website, as anyone would then be free to "frame" or in-line link to that image with impunity, regardless of how deliberate the framer's effort to create the misimpression that the image is hosted on (and displayed from) the framing website. Under Defendant's view, a website can consist of nothing but in-line links, framed with as much additional context, advertising, and functionality as the website's owner can dream up, and still hold itself out as a content destination, all at the expense of (and in direct competition with) the websites that incur the cost of actually originating and hosting the content in the first place. The Court should decline Defendant's invitation to read the display right out of the Copyright Act in this manner.

### 3. Defendant's Infringement Of Plaintiff's Distribution Right

The Copyright Act also gives copyright owners the exclusive right "to distribute copies … of the copyrighted work to the public." 17 U.S.C. § 106(3). The undisputed facts demonstrate that Defendant distributed copies of Plaintiff's copyrighted images to visitors of websites that had implemented the Bing Image Widget.

Through the ordinary operation of the Bing Image Widget, Defendant, after selecting the images that it deemed most relevant to the website publisher's query, caused the end user's browser to download each of the selected images (including the Undisputed Works) to the end user's computer in order to display them in the Bing Image Widget display panel. SUF ¶ 31. Those electronic file transfers, which Defendant caused and directed for the sole and specific purpose of displaying images in the Bing Image Widget (and not for any "search" purpose), violated Plaintiff's exclusive right to distribute its copyrighted works. *See Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640, 651 (S.D.N.Y. 2013) ("[a]n electronic file transfer is plainly within the sort of transaction that § 106(3) was intended to reach [and] . . . fit[s] within the definition of 'distribution' …." (quoting *London-Sire Records, Inc. v. Doe 1*, 542 F. Supp. 2d 153, 173-74 (D. Mass. 2008) (alterations in original)).

### C. Defendant's Attempt To Avoid Direct Liability Based On A Supposed Lack Of "Volition" Is A Red Herring.

In its prior briefing, Defendant attempted to cast this case as one involving secondary, not direct, liability. "Microsoft can only be indirectly liable," Defendant argued, "because Microsoft is not the volitional actor." Def. Opp. to Prelim. Inj. at 2, 16-17, Dkt. #11. The discussion of "volition" is ultimately irrelevant, however, as Defendant's volitional conduct (to the extent that

volition is even required for direct liability)[7] is immediately apparent from the exclusive control

that Defendant exercises over the entire process by which images are selected, displayed and

distributed through the operation of the Bing Image Widget.  SUF ¶¶ 28, 33.   Indeed, even the

*Perfect 10* court saw no need to examine the volition requirement:   "Because Google initiates

and controls the storage and communication of these thumbnail images, we do not address

whether an entity that merely passively owns and manages an Internet bulletin board or similar

system violates a copyright owner's display and distribution rights when the users of the bulletin

board or similar system post infringing works."   *Perfect 10*, 508 F.3d at 1160 n.6; *see also*

*Perfect 10, Inc. v. Giganews, Inc.*, No. CV11-07098, 2013 WL 2109963, at *7 (C.D. Cal. Mar. 8,

2013) ("[T]here was no question in [*Perfect 10 v. Amazon*] that the defendant had committed a

volitional act" because Google had "created thumbnails and cached pages of infringing photos

and websites").

      Neither can Defendant hide behind the fact that it employed an automated search

algorithm to select the images to display in the Widget.   *See* Def. Opp. to Prelim. Inj. at 17

---

[7] Although Defendant's volition is beyond dispute here, the existence of a "volition" requirement
for direct liability is dubious in the wake of the Supreme Court's recent decision in *American
Broadcasting Cos. v. Aereo, Inc.*, 134 S. Ct. 2498 (2014).   In reversing a decision from the
Second Circuit, a majority of the Court acknowledged – and ultimately dismissed – the dissent's
call for "volition" as an element of direct infringement of the public performance right.   *Id.* at
2507.   Moreover, even before *Aereo*, the notion of a "volition" requirement has been criticized or
questioned by leading copyright scholars and other courts.   *See, e.g.,* 4 *Nimmer on Copyright* §
13.08[C], at 13-290.4-.5 (stating "respectful[] disagree[ment]" with the Second Circuit's
"treatment of volitional conduct");   II Paul Goldstein, *Goldstein on Copyright* § 7.0.2, at 7:8:1
(3d ed. 2014 Supp.) ("American copyright law has never required that liability for direct
infringement be imposed only on the individual who presses the 'record' button"); *Soc'y of Holy
Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 55 (1st Cir. 2012) (noting that the
"volitional act' position" had been raised in other circuits with only "varying degrees of
success"), *cert. denied*, 133 S. Ct. 1315 (2013).   Indeed, shortly after the *Aereo* decision, the U.S.
Copyright Office requested public comment on "how should courts consider the requirement of
volitional conduct when assessing direct liability in the context of interactive transmissions of
content over the Internet, especially in the wake of *Aereo*?"   79 Fed. Reg. 41,309, 41,310 (July
15, 2014).

(arguing that Defendant was a passive actor whose search algorithm "merely functions automatically in response to user commands").  In other contexts, search engine providers trumpet the volitional aspects of their algorithms, arguing that search results are the "opinions" of the search engine provider.  *See, e.g., Search King, Inc. v. Google Tech., Inc.*, No. CIV-02-1457-M, 2003 WL 21464568, at *3-4 (W.D. Okla. May 27, 2003) (finding that search rankings were "subjective result[s]" that constituted "opinions" of the search engine provider).  As Judge Furman of this district observed, automated search algorithms necessarily incorporate the search engine provider's editorial judgments about what to display:

> [S]earch engines inevitably make editorial judgments about what information (or kinds of information) to include in the results and how and where to display that information (for example, on the first page of the search results or later) . . . .  After all, the algorithms themselves were written by human beings, and they inherently incorporate the search engine company engineers' judgments about what material users are most likely to find responsive to their queries.

*Jian Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d 433, 438-39 (S.D.N.Y. 2014) (internal quotation marks omitted).

Just as in the foregoing cases, Defendant exercised editorial judgments about which images should be displayed in the Bing Image Widget.  While website publishers may have decided which queries to run, it was Defendant – and Defendant alone – that selected which images to display in response to any particular query.  SUF ¶ 33.  Thus, for example, a website publisher's query of "Ferguson, Missouri" would surely have resulted in the display of a far different set of images if run before August 9, 2014 – the date on which a highly publicized police shooting sparked months of civil unrest – than if that same query were run after that date, for reasons entirely within Defendant's exclusive control and discretion.  Similarly, it was Defendant, not the operator of the "healthnexercise.com" website, that chose to display one of Plaintiff's copyrighted images in response to the simple "fitness" query in that site's

implementation of the Bing Image Widget. SUF ¶ 55. In these circumstances, Defendant's volition in the act of infringement cannot reasonably be questioned.

## II. Defendant's Infringement Cannot Be Excused As Fair Use.

Defendant contends that its use of Plaintiff's copyrighted images in connection with the Bing Image Widget is fair use. "The issue of fair use may be resolved on summary judgment where the court determines that there is no genuine dispute of material facts." *Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 550 (S.D.N.Y. 2013) (citing *Bill Graham Archives v. Dorling Kindersley, Ltd.*, 448 F.3d 605, 608 (2d Cir. 2006)); *Wright v. Warner Books, Inc.*, 953 F.2d 731, 735 (2d Cir. 1991). Because "fair use is an affirmative defense, the burden of proof rests" with Defendant. *Meltwater*, 931 F. Supp. 2d at 550; *see also Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 107 (2d Cir. 1998) ("Since fair use is an affirmative defense to a claim of infringement, the burden of proof is on its proponent."). Defendant cannot carry that burden.

In assessing fair use, courts are to consider four factors: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. 17 U.S.C. § 107; *see Meltwater*, 931 F. Supp. 2d at 550. Here, all four factors weigh heavily against fair use.

The first fair use factor, the "purpose and character" of the use, "comprises principally two considerations: whether the use is 'commercial' and whether it is 'transformative.'" *Lennon v. Premise Media Corp.*, 556 F. Supp. 2d 310, 321 (S.D.N.Y. 2008). Defendant's use of copyrighted imagery in the Bing Image Widget was undeniably commercial in nature. Among other things, Defendant displayed its own logo along with the images in the Widget and used the

Bing-branded display to direct users to Defendant's own Bing Image Search website, all without permission from or payment to any copyright owner. SUF ¶¶ 17, 38-39, 56. Moreover, Defendant expressly reserved the right to charge direct fees for the use of the Widget and to further monetize the service by placing advertisements in the display panel. SUF ¶ 42. Defendant thus clearly "[stood] to profit from the exploitation of the copyrighted material without paying the customary price." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562 (1985).

Neither was Defendant's use of images "transformative." To the contrary, Defendant merely copied and displayed the copyrighted images as they appeared on the Internet more generally. SUF ¶¶ 9, 35-36, 53; *see also* Supp. Miyashita Decl., Att. A; Aul. Decl. Ex. I. A "use of copyrighted material that merely repackages or republishes the original is unlikely to be deemed a fair use." *Infinity Broadcast*, 150 F.3d at 108; *see Meltwater*, 931 F. Supp. 2d at 551.

Moreover, the Bing Image Widget served essentially the same purpose as Plaintiff's own services, and thus "supersede[d] the objects of the original creation." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994) (internal quotation marks omitted). Plaintiff's core business, as noted above, is licensing its industry-leading visual content to websites (among others). SUF ¶¶ 1-3. Defendant's stated goal for the Bing Image Widget was much the same – to provide content to website publishers that will draw users to their websites and, ultimately, to Defendant's own universe of websites. SUF ¶¶ 13-15, 38. Because "the underlying purpose of [Defendant's] use is the same as [Plaintiff's] original purpose," its use cannot be transformative. *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 101 (2d Cir. 2014); *see also, e.g., Infinity Broadcast*, 150 F.3d at 108 ("use of copyrighted material that merely repackages or republishes the original is unlikely to be deemed a fair use" (internal quotation marks omitted)); *Fox News*

*Network, LLC v. TVEyes, Inc.*, 13 Civ. 5315, 2014 WL 4444043, at *10 (S.D.N.Y. Sept. 9, 2014) (fair use unavailable where defendant "provides essentially the same service as could be provided by the content provider itself").

The second and third factors so flatly disfavor a finding of fair use that they require little discussion. As to the "nature of the . . . work," Plaintiff's distinctive images are "expressive [and] creative" works of photographic expression, and thus at the "core of intended copyright protection." *Cariou v. Prince*, 714 F.3d 694, 709 (2d Cir. 2013) (internal quotation marks omitted), *cert. denied*, 134 S. Ct. 618 (2013). And Defendant, through the Bing Image Widget, took *the whole* of Plaintiff's images, reproducing and displaying them in their entirety. "[G]enerally, it may not constitute a fair use if the entire work is reproduced." *Infinity Broad.*, 150 F.3d at 109 (quotation marks omitted).

The last factor – the effect on "the potential market for or value of" Plaintiff's copyrighted works – shows even more clearly the fundamental unfairness of Defendant's infringing use. This factor "requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590. It "is aimed at the copier who attempts to usurp the demand for the original work," *Consumers Union of U.S., Inc. v. Gen. Signal Corp.*, 724 F.2d 1044, 1050 (2d Cir. 1983), which is precisely what Defendant has done here.

As noted, Plaintiff's core business is licensing its images to website publishers (among others) so they can lawfully use those images on their sites. SUF ¶¶ 1-3. Plaintiff has also developed its own "Embed" tool, which allows users (for free) to embed Plaintiff's copyrighted

images on websites, blogs, and social media sites for noncommercial purposes. SUF ¶ 4. This tool carries Plaintiff's trademark, includes attribution for photographers, and provides for easy sharing of images via Facebook, Twitter, and the like – all of which helps build Plaintiff's brand. SUF ¶ 4; *see also* Aul Decl., Ex. D. A click on the image takes the user to Plaintiff's website, which permits the user to license the image for commercial use. SUF ¶ 4; *see also* Miyashita Decl., Att. B, C.

Through the Bing Image Widget, Defendant used Plaintiff's copyrighted images to "directly compete[] with" Plaintiff's own services, thereby undermining the market for, and value of, Plaintiff's copyrights. *Meltwater*, 931 F. Supp 2d at 561. Without any permission whatsoever, Defendant used Plaintiff's protected images in precisely the same manner as Plaintiff sought to license them, all but eliminating the incentive of website publishers to seek licenses from Plaintiff. As one reviewer of the Bing Image Widget asked, with the availability of the Widget, would "anyone need to pay for images anymore?" SUF ¶ 44.[8] Because the Bing Image Widget threatened to "usurp[] or substitute[] for the market of [Getty's] original work," Defendant's use is not fair. *Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.*, 150 F.3d 132, 145 (2d Cir. 1998).

Indeed, the blatant similarity between the Bing Image Widget and Plaintiff's own Embed tool makes it difficult to imagine a more direct attempt at market substitution. Compare Aul Decl. Ex., D (screenshots of websites with Plaintiff's Embed tool) with Aul Decl. Ex., H (screenshots of websites with Bing Image Widget). Both companies provide website publishers with an embedded panel through which each company displays images to the end user. The key

---

[8] Or, as another reviewer put it: "the best part [of the Bing Image Widget]? You don't have to worry about copyright infringements since you're not embedding copyrighted images onto your site – you're just serving images from a search engine!" SUF ¶ 45.

difference, of course, is that instead of displaying the Getty Images logo and attributions, and instead of directing end users to the Getty Image website, the Bing Image Widget substituted the Bing logo, displayed no information to suggest that the images displayed came from anyone other than Defendant absent action by the end user, and directed end users to Defendant's own website. SUF ¶¶ 17, 38-39. Defendant thus used Plaintiff's images in exactly the same manner as Plaintiff's Embed tool, but misappropriated all of the brand-building benefits and monetization opportunities that otherwise would flow to Plaintiff. SUF ¶ 4. The mere fact that Plaintiff's copyrighted images were displayed on third-party commercial websites through the Bing Image Widget within even the first days of the Widget's release is proof enough of the Widget's adverse effect on the potential market for Plaintiff's works. SUF ¶¶ 53-55. That the last fair use factor calls for evaluation of potential market harm based on a hypothetical "unrestricted and widespread" use of the Widget – a use that was prevented here only by Plaintiff's prompt action in filing this suit – makes the point even clearer.

Defendant will no doubt argue, as they did at the outset of this case, that none of this unfairness matters. Bing is a search engine, Defendant will say, and the creation and display of reduced-size "thumbnail" images in connection with a search engine was held to be a "transformative" (and thus fair) use in *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007). There, the Ninth Circuit concluded that a search engine's creation and display of reduced-size, low resolution thumbnails of copyrighted images was fair use because it transformed the images from serving "an entertainment, aesthetic, or informative function . . . into a pointer directing a user to a source of information." *Id.* at 1165. The images in that case thus "serve[d] a different function than the original work." *Id.*

But the Bing Image Widget was not a search engine, nor did it "transform" Plaintiff's copyrighted images from their "entertainment, aesthetic, or informative function" into "pointer[s] directing a user to a source of information," as was the case in *Perfect 10.* To the contrary, Defendant provided images precisely for their "entertainment, aesthetic, or informative function" and marketed the Bing Image Widget to website publishers as a source of content whose visual appeal would attract users to their websites. SUF ¶¶ 13-14. The Bing Image Widget thus served as a substitute for the exact same content that Plaintiff licenses to the exact same market for the exact same use. Defendant did not operate the Bing Image Widget as a search engine, SUF ¶¶ 40-41, but rather as a means of providing websites with visually appealing content – albeit content that Defendant had no right to provide – in direct competition with Plaintiff's own licensed offerings. SUF ¶¶ 13-14, 56.

The mere fact that Defendant's Bing Image Widget made use of image-search functionality does not immunize Defendant. In *Associated Press v. Meltwater*, this Court rejected a nearly identical attempt to create such a "search engine immunity." In *Meltwater*, the defendant used search-engine functionality to provide excerpts of copyrighted news articles to its users and claimed that, as a search engine, its use was fair under the Ninth Circuit's reasoning in *Perfect 10*. 931 F. Supp. 2d at 541, 544, 555. This Court disagreed, explaining that "using the mechanics of search engines to scrape material from the Internet and provide it" to users does not render a use transformative or fair, and that cases like *Perfect 10* do "not relieve [a defendant] of its independent burden to prove that its specific display . . . qualifies as a fair use." *Id.* at 556.

Instead, the *sine qua non* of the fair use recognized in *Perfect 10* is that the service's function must be "to allow users to sift through the deluge of data available through the Internet and to direct them to the original source" and thus to "serve as a pointer to a source of

information rather than serving as a form of entertainment" or content itself. *Meltwater*, 931 F. Supp. 2d at 555-56. This is the opposite of what the Bing Image Widget does. *See also TVEyes, Inc.*, 2014 WL 4444043, at *11 (observing that there was no fair use in *Meltwater* because the defendant "simply 'crawled' the Internet, gathering extant content" and "simply amalgamated [that] extant content that a dedicated researcher could piece together with enough time, effort, and Internet searches").

The Bing Image Widget might have made use of information and content created by Defendant's search engine, but the Widget itself was not about search. Its purpose instead was to offer to websites "beautiful, configurable image galleries and slideshows"—and to entice users into Defendant's family of websites. In these circumstances, cases like *Perfect 10* are far off point, and "fair use" cannot excuse Defendant's infringing conduct.

## III.    Defendant's Affirmative Defense Of "Unclean Hands" Fails As A Matter Of Law.

In its Answer, Defendant asserts as an affirmative defense that Plaintiff has "unclean hands" because Plaintiff allegedly infringed an entirely separate set of copyrights and trademarks owned by Defendant, in circumstances having nothing to do with Defendant's infringement of Plaintiff's works through the Bing Image Widget. *See* Answer and Counterclaims at 6, Dkt. #70. As Plaintiff has already explained in prior briefing in this case, Defendant's claim of Plaintiff's supposed "unclean hands" is meritless as a matter of fact. Pltf's Response to Def's Supp. Mem. in Opp. to Prelim. Inj. at 9-11, Dkt. # 51. But for purposes of the present motion, it is enough that the defense fails as a matter of law as well.

It is well settled in the Second Circuit, and elsewhere, that the doctrine of "unclean hands" is narrow, applying "only where the misconduct alleged as the basis for the defense 'has immediate and necessary relation to the equity that [plaintiff] seeks in respect of the matter in

litigation.'" *Specialty Minerals, Inc. v. Pluess-Staufer AG*, 395 F. Supp. 2d 109, 112 (S.D.N.Y. 2005) (quoting *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245 (1933)); *see also, e.g., id.* ("The Second Circuit has repeatedly emphasized the narrowness of the doctrine's application" (citing *Warner Bros., Inc. v. Gay Toys, Inc.,* 724 F.2d 327, 334 (2d Cir. 1983))); *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 842 F. Supp. 2d 682, 713 (S.D.N.Y. 2012) ("If the alleged misconduct is 'unrelated to the claim to which it is asserted as a defense, [it] does not constitute unclean hands.'" (quoting *Dunlop-McCullen v. Local 1-S, AFL-CIO-CLC,* 149 F.3d 85, 90 (2d Cir. 1998))).

With respect to copyright claims, the defense of unclean hands has been recognized "only rarely, when the plaintiff's transgression is of serious proportions and relates directly to the subject matter of the infringement action." 4 *Nimmer on Copyright* § 13.09[B], at 13-312. The plaintiff "must have 'either participated in the acts of infringement or . . . committed some 'transgression' such as fraud upon the Copyright Office resulting in harm or prejudice to the defendant.'" *Jackson v. Odenat*, 9 F. Supp. 3d 342, 364 (S.D.N.Y. 2014) (quoting *Coleman v. ESPN, Inc.*, 764 F. Supp. 290, 296 (S.D.N.Y. 1991)); *see also Malibu Media, LLC v. Lee*, No. 12-cv-03900, 2013 WL 2252650, at *9 (D.N.J. May 23, 2013) (unclean hands defense "is meant to relate directly to the offense in issue – in this case, the actual copyright infringement alleged").

Defendant's unclean hands defense falls well short of these strict requirements. Defendant's (baseless) allegation that Plaintiff engaged in unauthorized licensing of photographs of *Defendant's* copyrighted images and trademarked logos through its online store has nothing to do with Defendant's infringement of *Plaintiff's* works through the Bing Image Widget. Defendant's counterclaims (on which the defense of unclean hands is premised) allege a wholly

different set of circumstances, different intellectual property, and different participants, not some "transgression" that "relates directly" to the subject matter of this action.

In fact, the only connection between Plaintiff's claims and Defendant's defense of unclean hands is that both broadly involve claims of intellectual property infringement. This Court has recognized, however, that "an allegation of a similar pattern of misconduct does not, in itself, establish the requisite relationship where the conduct, claims and facts at issue do not intersect." *Specialty Minerals*, 395 F. Supp. 2d at 114 (citing *De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate Inc.*, No. 04 Civ. 4099, 2005 WL 1164073, at *3-4 (S.D.N.Y. May 18, 2005)). Courts routinely reject such attempts to cast independent allegations of wrongdoing as "unclean hands." *See, e.g.*, *Warner Bros.,* 724 F.2d at 334 (plaintiff's false accusation of copyright infringement did not relate to right in suit in trademark litigation); *De Beers LV Trademark Ltd.*, 2005 WL 1164073, at *3 (plaintiff's alleged anti-competitive behavior did not relate to right in suit in trademark litigation); *Malibu Media, LLC*, 2013 WL 2252650, at *9 (allegation that plaintiff used its copyrights to initiate several hundred nuisance suits did not support unclean hands defense to copyright infringement because previous suits pertained to different copyrights); *Sw. Bell Media, Inc. v. Trans W. Publ'g Inc.*, 670 F. Supp. 899, 910 (D. Kan. 1987) (allegation that plaintiff "practice[ed] the same sort of copying as defendant" did not support unclean hands defense to copyright infringement because plaintiff's alleged infringement involved copyrights not at issue in plaintiff's suit). Because Defendant's allegation of unclean hands lacks the requisite "immediate and necessary relation" to Plaintiff's claims of infringement, the defense is no bar to relief here as a matter of law.[9]

---

[9] Defendant asserts other affirmative defenses, *see* Answer at 6, Dkt. #70, but all of those are addressed to the *remedies* for Defendant's copyright infringement, not the question of Defendant's liability for infringement in the first instance, only the latter of which is the subject

## CONCLUSION

For the foregoing reasons, the Court should grant partial summary judgment in Plaintiff's favor with respect to Defendant's direct liability for copyright infringement.

Dated: January 16, 2015

Respectfully submitted,

_____/s/ Kenneth L. Doroshow_____
Kenneth L. Doroshow (KD-8374)
Amir H. Ali (admitted *pro hac vice*)
Zachary C. Schauf (admitted *pro hac vice*)
JENNER & BLOCK LLP
1099 New York Ave., N.W.
Suite 900
Washington, DC 20001
Telephone: (202) 639-6027
Facsimile: (202) 639-6066

*Attorneys for Plaintiff*

---

of the present motion. Moreover, as has already been shown in prior briefing, Defendant's suggestion that Plaintiff should be required to send "takedown" notices under the Digital Millennium Copyright Act ("DMCA") to have its images removed from the Bing Image Search index is a makeweight. *See* Def's Opp. to Prelim. Inj. at 13 & n.7, Dkt #11 (citing 17 U.S.C. § 512(d)); *see also* Answer at 6 (Seventh Affirmative Defense asserting DMCA as bar to Plaintiff's claims). The DMCA's safe harbor provisions "describe separate and distinct functions" for purposes of determining whether an Internet service provider is entitled to immunity – in other words, that immunity is not provided on a blanket basis, but instead is limited only to the particular function at issue. *See* 17 U.S.C. § 512(n); *see also Perfect 10, Inc. v. CCBill, LLC*, 488 F.3d 1102, 1116-17 (9th Cir. 2007) (noting that Internet service provider "does not receive blanket immunity for its other services" even where one of its services is entitled to safe harbor). The DMCA has no application where, as here, Defendant is not functioning as a search engine; nor are the images themselves necessarily infringing in their original location, as the DMCA contemplates. *See* 17 U.S.C. § 512(d) (referring to liability by reason of an information location tool's linking to "an online location containing infringing material"). Indeed, the suggestion that Plaintiff's only remedy is to have its images removed from the search engine would unfairly "shift the burden to the copyright holder to prevent unauthorized use instead of placing the burden on the infringing party to show it had properly taken and used content." *Meltwater*, 931 F. Supp. at 563. As this Court has observed, "most Internet users (and many owners of websites) would like crawlers employed by search engines to visit as many websites as possible, to include those websites in their search results, and thereby to direct viewers to a vast array of sites." *Id.* at 564. Defendant's proposed resolution, which would require Plaintiff to remove itself from the Internet, is thus no resolution at all.